```
 1            IN THE UNITED STATES MAGISTRATE COURT
                   WESTERN DISTRICT OF TEXAS
 2                     EL PASO DIVISION


 3
    UNITED STATES OF AMERICA      )
 4                                )
    v                             )   No. EP:06-CR-01261(1)FM
 5                                )
    JUAN CARLOS RUFFIER           )
 6

 7            ARRAIGNMENT AND DETENTION HEARING
           BEFORE THE HONORABLE ANNE T. BERTON
 8             UNITED STATES MAGISTRATE JUDGE
                    MARCH 15, 2017
 9

10  APPEARANCES:

11  For the Government:   Ms. Debra Kanof
                          and
12                        Mr. Adrian Gallegos
                          Assistant United States Attorney
13                        700 East San Antonio, Suite 200
                          El Paso, Texas 79901
14

15  For the Defendant:    Mr. Manuel Acosta
                          and
16                        Mr. Reginaldo Trejo
                          Assistant Federal Public Defender
17                        700 East San Antonio, Suite D-401
                          El Paso, Texas 79901
18

19

20

21

22

23  Proceedings recorded by electronic recording.

24  Transcript produced by Rhonda McCay, CSR, RPR.

25
```

1                         **I N D E X**

2    GOVERNMENT'S CASE IN CHIEF:

3    WITNESS                                          PAGE

4    JAMES RANKIN
        Direct By Ms. Kanof                          9
5        Cross By Mr. Acosta                         50
         Redirect By Ms. Kanof                       72
6        Recross By Mr. acosta                       74

7

8    Government Rests                                 76

9    DEFENDANT'S CASE IN CHIEF:

10   Proffer by Mr. Acosta                            77

11   Proffer by Ms. Kanof                             80

12   Defendant Rests                                  83

13   CLOSING ARGUMENT
        by the Defendant                            84
14       by the Government                           88

15

16   Findings of the Court                            97

17   Certificate of the Court Reporter               98

18

19

20

21

22

23

24

25

1        (Proceedings called to order)

2        THE COURT:  Good morning.  Please be seated.

3        The Court calls the case of the United States

4  of America versus Juan Carlos Ruffier in EP:06-1261 for

5  a district court arraignment and detention hearings.

6        May I have announcements, please.

7        MS. KANOF:  Good morning, Your Honor.  Debra

8  Kanof and Adrian Gallegos, for the United States.  We're

9  ready.

10        THE COURT:  Thank you.

11        MR. ACOSTA:  Good morning, Your Honor.  Manuel

12  Acosta and Reginaldo Trejo.  Mr. Ruffier is also

13  present.  We're ready.

14        THE COURT:  All right.  We're scheduled for an

15  arraignment and detention hearing today and nothing

16  else.  So we'll start with the arraignment.

17        If you'll approach the podium with your client,

18  Mr. Acosta.

19        MR. ACOSTA:  Thank you, Your Honor.

20        THE COURT:  Now, is your true name -- true and

21  correct name Juan Carlos Ruffier?

22        THE DEFENDANT:  Yes, Your Honor.  The II,

23  usually.  I go by both.  Juan Carlos Ruffier is on my

24  birth certificate, but Juan Carlos Ruffier, comma, the

25  II, since my father is -- also has the same name.

1          THE COURT:  And what is your legal name?

2          THE DEFENDANT:  On my birth certificate, it's

3    Juan Carlos Ruffier.

4          THE COURT:  Okay.  So it's correct the way it

5    is on the indictment?

6          THE DEFENDANT:  Yes.  Yes, Your Honor.

7          THE COURT:  All right.  Mr. Ruffier, did you

8    receive a copy of an indictment?

9          THE DEFENDANT:  Yes.  I've seen the paperwork,

10   various, ma'am.  Yes, Your Honor.

11         THE COURT:  Did you have an opportunity to

12   review it?

13         THE DEFENDANT:  Yes.  I've had an opportunity

14   to review it, but I don't understand it all completely

15   [indiscernible].

16         THE COURT:  Okay.  Do you need some time to

17   review it with your attorney, Mr. Ruffier?

18         THE DEFENDANT:  No.  I think we can continue.

19   I trust my attorneys.  I don't understand a couple of

20   the things on there.  That's all, Your Honor.

21         THE COURT:  Okay.  Mr. Acosta, is your client

22   ready to make -- go through with the arraignment?

23         MR. ACOSTA:  He is ready, Your Honor.  And he

24   will listen, obviously, to the Court's reading of the

25   indictment and he will enter a plea, at this point, of

1   not guilty, of course.

2           THE COURT:  Okay.  And, Mr. Ruffier, also

3   [indiscernible] this hearing is that, of course, you

4   will, as you have already, be able to talk to your

5   attorney and ask him whatever questions you have.  Do

6   you understand that, sir?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  All right.  Mr. Ruffier, you are

9   charged by indictment here in the Western District of

10  Texas in six counts:

11          In Count One with international parental

12  kidnapping, and essentially it reads as follows:  That

13  beginning on or about April the 15th, 2005, and

14  continuing until and including on or about December the

15  12th, 2005, in the Western District of Texas and

16  elsewhere, the defendant, Juan Carlos Ruffier, knowingly

17  and intentionally removed a child, initials J.R., from

18  the United States, and retained the child, initials

19  J.R., outside of the United States with the intent to

20  obstruct the lawful exercise of parental rights of

21  initials O.R., in violation of Title 18, United States

22  Code, Section 1204.

23          And you're charged in Count Two with interstate

24  communications.  It reads as follows:  That on or about

25  February the 3rd, 2006, in the Western District of Texas

1    and elsewhere, the defendant, Juan Carlos Ruffier,

2    knowingly did transmit in interstate and foreign

3    commerce from Argentina to El Paso, Texas, a telephone

4    text messaging communication to initials W.F., which

5    telephone text messaging communication contained a

6    threat to injure the person of initials J.A.R., that is

7    in violation of Title 18, United States Code, Section

8    875(c).

9         And you are charged in Count Three with

10   threatening a federal officer, and it reads as follows:

11   That on or about February the 3rd, 2006, in the Western

12   District of Texas and elsewhere, the defendant, Juan

13   Carlos Ruffier, did knowingly threaten to assault and

14   threaten to murder initials J.A.R., a federal law

15   enforcement officer, with the intent to impede,

16   intimidate, interfere with, and retaliate against

17   initials J.A.R. while engaged in and on account of the

18   performance of initials J.A.R.'s official duties, in

19   violation of Title 18, United States Code, Section

20   115(a)(1)(A).

21        And you're charged in Count Four with

22   interstate communications, and it reads as follows:

23   That on or about May the 2nd, 2006, in the Western

24   District of Texas and elsewhere, the defendant, Juan

25   Carlos Ruffier, knowingly did transmit in interstate and

foreign commerce from Argentina to El Paso, Texas, a

telephone communication to initials W.F., which

telephone communication contained a threat to injure the

person of initials W.F., that is, in violation of Title

18, United States Code, Section 875(c).

And you're charged in Count Five with

obstructing justice by retaliating against a witness,

victim or an informant. And it reads as follows: That

on or about May the 6th, 2006, in the Western District

of Texas and elsewhere, the defendant, Juan Carlos

Ruffier, did knowingly threaten to cause bodily injury

to initials W.F. with the intent to retaliate against

initials W.F. for providing information to a law

enforcement officer relating to the commission and

possible commission of a federal offense, that is, in

violation of Title 18, United States Code, Section

1513(b).

And you're charged in Count Six with

obstructing justice by retaliating against a witness,

victim or an informant. And it reads as follows: That

beginning on or about April of 2006, continuing through

and including the date of this indictment, in the

Western District of Texas and elsewhere, the defendant,

Juan Carlos Ruffier, did knowingly and with the intent

to retaliate, took action harmful to initials W.F.,

1    interfering with initials W.F.'s lawful employment and

2    livelihood because of initials W.F.'s conduct in

3    providing truthful information to a law enforcement

4    officer relating to the commission and possible

5    commission of a federal offense, that is, in violation

6    of Title 18, United States Code, Section 1513(e).

7              Now, Mr. Ruffier, do you understand those

8    charges?

9              THE DEFENDANT:  Yes, ma'am.  Yes, Your Honor.

10             THE COURT:  Are you entering a plea of not

11   guilty to those charges?

12             THE DEFENDANT:  Not guilty, Your Honor.

13             THE COURT:  To all six charges, Mr. Ruffier?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  You're not guilty will be -- you're

16   not guilty plea will be entered as to all six counts.

17             You may be seated at this time with your

18   client, Mr. Acosta.

19             MR. ACOSTA:  Thank you, Your Honor.

20             THE DEFENDANT:  Thank you, Your Honor.

21             THE COURT:  Right now we will proceed with the

22   detention hearing.

23             Ms. Kanof, please call your first witness.

24             MS. KANOF:  Yes, Your Honor.  The government

25   calls Special Agent James Rankin.

1           (Witness sworn)

2           THE COURT:  Please have that seat, and please

3  get close to the microphone.

4           THE WITNESS:  Yes, ma'am.

5           THE COURT:  And I am going to ask the attorneys

6  to please use the podium, use the microphones when you

7  address the Court during this hearing.

8           Go ahead, Ms. Kanof.

9           MS. KANOF:  Thank you, Your Honor.

10          First, Your Honor, the government asks the

11  Court to take judicial notice of the probable cause that

12  was found by the grand jury in this case.

13                        JAMES RANKIN,

14  having been first duly sworn, testified as follows:

15                     DIRECT EXAMINATION

16  BY MS. KANOF:

17     Q.   Would you state your name for the grand jury --

18  I mean, I'm sorry -- for the Court.

19     A.   Yes, ma'am.  James Rankin.

20     Q.   And, sir, how are you employed?

21     A.   I'm a supervisory special agent with the FBI.

22     Q.   And could you just briefly give the Court your

23  educational and employment background?

24     A.   Yes, ma'am.  I have a bachelor's degree from

25  the University of Texas, El Paso.  I spent 20 years with

1    the FBI.  Part of that, I spent six years in the United

2    States Army.  I was a military police officer, an Army

3    Criminal Investigation Division agent, and I spent seven

4    and a half years with El Paso Police Department, where I

5    was a police officer, a homicide detective and a

6    sergeant, patrol sergeant.

7         Q.   Okay.  And how long have you been with the FBI?

8         A.   20 years, ma'am.

9         Q.   What is your current position with the FBI?

10        A.   I'm the resident agent in charge of the Fort

11   Myers Office of the Federal Bureau of Investigation,

12   [indiscernible] the Tampa Division.

13        Q.   Okay.  That would be Fort Myers, Florida?

14        A.   Yes, ma'am.

15        Q.   When you were assigned to the El Paso Division,

16   were you assigned to a case of the United States of

17   America versus Juan Carlos Ruffier?

18        A.   Yes, ma'am, I was.

19        Q.   Okay.  And that was back approximately in 2005

20   and 2006?

21        A.   It was, yes.

22        Q.   Do you need water, Agent Rankin?

23        A.   No.  I'm good, ma'am.

24        Q.   Okay.  And is he here in the courtroom?

25        A.   Yes, he is.

1    Q.   Would you identify him please by indicating

2   where he is sitting and what he is wearing.

3    A.   Yeah.  Mr. Ruffier is sitting at the defense

4   table.  He's wearing a blue jumpsuit and he has gray

5   hair.

6    Q.   And what -- particularly what section of the

7   FBI were you assigned when you were here in El Paso at

8   the time that you investigated this case?

9    A.   I primarily worked on the Violent Crime Squad.

10    Q.   Okay.  And you're talking just a little bit

11   fast for me.  If you could slow down just a little bit.

12    A.   Yes, ma'am.

13    Q.   Okay.  And how did this case come to your

14   attention?

15    A.   So on April 26th of 2005, Ogla Ruffier walked

16   into the El Paso Division of Federal Bureau of

17   Investigation.  She wanted to make a complaint

18   concerning international criminal kidnapping.

19    Q.   Who is Olga Ruffier?

20    A.   She is the ex-wife of the defendant, Juan

21   Carlos Ruffier.

22    Q.   What is her nationality?

23    A.   She is from Russia.

24    Q.   Okay.  And did she speak English?

25    A.   Yes, ma'am.

```
1      Q.   And you said she was a walk-in.  What does that

2  mean?

3      A.   So she -- she walked into the El Paso Division

4  of the FBI.  She didn't have a prior appointment.  She

5  came in to make a complaint.

6      Q.   What did she complain to the FBI?

7      A.   She wanted to make a complaint concerning an

8  international criminal kidnapping, the abduction of her

9  child, Jonathan Charles Ruffier.

10     Q.   And how old was the child?

11     A.   Three years old at that time, ma'am.

12     Q.   What did she relate to the FBI?

13     A.   She conveyed to me that -- I met with her in

14 the lobby, and she conveyed to me that she and

15 Mr. Ruffier, the defendant, had been married in Russia;

16 that they had moved to Buenos Aires, Argentina.  And I

17 believe it was approximately 2002 when Jonathan Charles

18 Ruffier was born to the couple.

19     Q.   Okay.  Now, you said they moved to Argentina.

20 The defendant, Mr. Ruffier, is he a citizen of Argentina

21 or was he at some time?

22     A.   Yes, ma'am.

23     Q.   Where was he born?

24     A.   I don't know, ma'am.  I believe he was with

25 born [indiscernible], but I'm not sure.
```

1    Q.   But he was a citizen at one time of Argentina?

2    A.   Yes, ma'am.

3    Q.   And he is a naturalized citizen of the United

4  States?

5    A.   Yes, ma'am.

6    Q.   Does he have family in Argentina?

7    A.   Yes, ma'am.

8    Q.   And so she indicated to you that at one time

9  they lived in Argentina; is that correct?

10    A.   That is correct.

11    Q.   What else did she relate to you?

12    A.   She told me that they had left Argentina in

13  approximately 2002.  They moved to El Paso, Texas, where

14  they lived for a period of time.

15    Q.   With the child?

16    A.   Yes, ma'am.

17    Q.   And what next?

18    A.   That they had separated at that point in 2002,

19  that she had returned to Russia for a period of time and

20  then come back.  Ultimately, the two divorced in

21  approximately 2004.  And in March of 2005, they reached

22  the terms of agreement concerning the custody of their

23  child, Jonathan.

24    Q.   They actually made an agreement; is that

25  correct?

1    A.   That is correct, ma'am.

2    Q.   And at some point in time, that agreement was

3   memorialized; is that correct?

4    A.   Yes.

5    Q.   But regardless, they agreed to -- to share

6   custody; is that correct?

7    A.   That's right.

8    Q.   Okay.  And what did she tell you with regard to

9   the kidnapping?

10    A.   Specifically, concerning the kidnapping, the

11   custody order had been granted by the 327th District

12   Court, Judge Linda Chew, here in El Paso County, Texas,

13   that the terms of the visitation -- well, primary --

14   both parents had custody of the child, but primary

15   custody went to the mother.  She was given the choice to

16   determine where the child would live, and Juan Carlos

17   Ruffier, the father, was provided visitation.

18    Q.   Okay.  At the time that the kidnapping

19   occurred, where were the child and the mother, Olga,

20   actually living?

21    A.   They were living in South Carolina.

22   Charleston, South Carolina.

23    Q.   And was Olga Ruffier working in Charleston,

24   South Carolina?

25    A.   Yes, ma'am.

1      Q.   Where -- did she relate to you, Olga Ruffier,

2  that she was in El Paso at the time that the child was

3  not returned to her?

4      A.   That's correct.

5      Q.   How did that occur?

6      A.   The initial agreement for the visitation was

7  going to be April 15th through the 17th of 2005.   Mr.

8  Ruffier and his wife, at the time, Linda -- I'm sorry,

9  Wenda Lee Ferrell, agreed to have Olga and the child fly

10 from Charleston, South Carolina, to El Paso, Texas, for

11 that visitation.

12     Q.   Okay.   I understand that Ms. Ferrell's official

13 name was Wenda, but does she go by Wendy?

14     A.   She does, yes, ma'am.

15     Q.   Okay.   And for purposes of your testimony, if

16 you would not mind using Wendy.   Is that all right?

17     A.   That would be fine, ma'am.

18     Q.   In the indictment is W.F., Wendy Ferrell?

19     A.   It is.

20     Q.   In the indictment, is J.A.R. you?

21     A.   It is, yes, ma'am.

22     Q.   Okay.   In Counts Two and Three, the victim

23 alleged is that you?

24     A.   Yes.

25     Q.   Okay.   And where W.F. is alleged as a victim is

1   that Wendy Ferrell?

2       A.   It is.

3       Q.   Okay.  So by the time that this visitation

4   occurred in April of 2005, was Mr. Ruffier now married

5   to Wendy Ferrell?

6       A.   He was.

7       Q.   And how were Olga Ruffier and the child able to

8   come to El Paso?

9       A.   Wendy told me that she paid for the ticket for

10  Olga and Jonathan to come to El Paso.

11      Q.   Okay.  The airline tickets?

12      A.   Yes, ma'am.

13      Q.   And when they arrived in El Paso, where did

14  Olga and the child stay?

15      A.   At a Hawthorne Suites near the airport.

16      Q.   And you said that they were going to have

17  visitation the 15th through the 17th of April; is that

18  correct?

19      A.   Yes, ma'am.

20      Q.   Was that going to be an overnight stay?

21      A.   No.  The visitation period was from 10:00 a.m.

22  to 4:00 p.m. each of those days.

23      Q.   Okay.  So the child was supposed to be returned

24  at 4:00 p.m. each day?

25      A.   Correct.

1     Q.  And they were -- and the child was supposed to

2  be returned to his mother, Olga; is that correct?

3     A.  Correct.

4     Q.  What did Olga relate to you occurred?

5     A.  That at 10:00 a.m. on April 15th, that Wendy

6  and Juan Carlos picked up the child for the visitation;

7  that at approximately 4:00 p.m. on April 15th, Wendy had

8  called Olga, said the child was sleeping, asked for an

9  additional hour.  After the hour passed, the child --

10     Q.  And Olga said yes or no?

11     A.  She said that would be fine.

12     Q.  Okay.  Go ahead.

13     A.  After that hour passed and the child was not

14  returned and she hadn't heard anything else, Olga began

15  to call Wendy's phone.  Did not receive any answer.

16     Q.  So the only communication that Olga had with

17  her son was not through Mr. Ruffier, the defendant, it

18  was with Ruffier's second wife, Wendy; is that correct?

19     A.  Yes, ma'am.

20     Q.  And so she attempted after that hour passed to

21  communicate and it was with Wendy; is that correct?

22     A.  Correct.

23     Q.  And what happened?

24     A.  There was no response.  There was no answer.

25     Q.  What did she do next?

1    A.   She filed an interference with the child

2  custody report with El Paso Police Department.

3    Q.   And what happened next?

4    A.   She -- well, she got ahold of her attorney at

5  that point.  The attorney reached back to the court

6  where the order had been issued and set a hearing for

7  April 20th of 2005, concerning the violation of the

8  court order.

9    Q.   Who was Mr. Ruffier's attorney with regard to

10  child custody at that time?

11    A.   So I believe it was Daisy Everhardt at that

12  time, ma'am.

13    Q.   Okay.  And in -- as -- as part of your

14  investigation, did you learn that Daisy Everhardt was

15  able to get ahold of Mr. Ruffier and notify him of the

16  date of that hearing?

17    A.   That is correct, yes, ma'am.

18    Q.   Okay.  Now, let's go back to the complaint that

19  Olga Ruffier made.  Did -- she didn't -- she didn't get

20  her son back on the 15th, did she?

21    A.   She did not.

22    Q.   Okay.  And she made a report to the police

23  department and contacted her attorney to contact the

24  court -- of the divorce court or the family court,

25  correct?

1     A.   Correct.

2     Q.   What happened the next day?  Did Olga Ruffier

3  find out that the defendant made a complaint with the El

4  Paso Police Department?

5     A.   Yes, ma'am.

6     Q.   Okay.  And explain that to this Court, please.

7     A.   So Olga was contacted by the El Paso Police

8  Defendant.  She had been informed by a El Paso police

9  officer that Juan Carlos had made a complaint on the

10 15th concerning an injury to a child, that there were

11 with two small bruises on the child's back that were

12 faded, and he made that report.

13          The officer -- I reviewed that police report.

14 The officer that made the report took down the

15 information, couldn't determine why the bruises were

16 caused, believed that they were old, and then spoke with

17 Olga.  He asked Olga what -- if something had happened

18 with the child.  And she said no, the child had not been

19 struck, that there was no issues or concerns with the

20 child.

21     Q.   Okay.  And then there were -- did the policeman

22 conclude that the injuries were older than had been

23 reported to him?

24     A.   He said that they were older, faded and older.

25 And he had -- there was no way he could determine what

1  had caused those.

2      Q.   And so the police department did not proceed;

3  is that correct?

4      A.   Well, they took the report, ma'am.  They

5  referred it to Child Protective Services, and had the

6  child been available, I think they would have certainly

7  pursued the matter.

8      Q.   Okay.  And we'll go into that a little bit

9  later.  So what happened then?  Was a hearing set?

10      A.   For the 20th -- April 20th, yes, ma'am.

11      Q.   And Daisy Everhardt did report that she was

12  able -- to her court, to Judge Chew, that she was able

13  to contact her client; is that correct?

14      A.   Yes, ma'am.

15      Q.   Did her client show up?

16      A.   He did not.

17      Q.   Okay.  And what did Judge Chew do with regard

18  to him not showing up for court?

19      A.   She issued warrant for him for -- for contempt

20  of court and issued $100,000 bond.  She also issued a

21  writ to the sheriff's office to take custody of the

22  child and return the child to the mother.

23      Q.   We are -- as this hearing proceeds, when you're

24  talking about threats made by the defendant.  But at

25  some point in time, did Wendy Ferrell start cooperating

1   with the FBI?

2       A.   She did.

3       Q.   And did she report to you any threats the

4   defendant made regarding Judge Chew as a result of that

5   order?

6       A.   She did.

7       Q.   What did she tell you?

8       A.   Specifically, that on several different

9   occasions, that Juan Carlos Ruffier, the defendant, had

10  said that he wanted to kill Judge Chew.

11      Q.   Now, with regard to the -- the son, at --

12  initially, did Wendy Ferrell communicate with the FBI

13  that she was assisting her husband at the time with the

14  kidnapping of the son?

15      A.   Initially, in the investigation, ma'am?

16      Q.   Yes.

17      A.   Yes.

18      Q.   What did she say?  I may not make my question

19  very clear.  Did she cooperate initially in April or May

20  of 2005?

21      A.   She did -- she did not, no, ma'am.

22      Q.   Okay.  So what efforts did you make in order to

23  try to find the son, initially?

24      A.   So based on the warrant that had been issued by

25  Judge Chew, I reached out to United States Marshals

1   Service, asked them if they would look for Mr. Ruffier.

2        Q.   Was that original warrant put in NCIC?

3        A.   Yes, ma'am.

4        Q.   Okay.  Continue, please.

5        A.   I also reached out to the attorneys at the

6   time, and I also spoke with Cori Harbour, who is an

7   additional attorney for Mr. Ruffier, with Albert Biel

8   who was the attorney for Olga.  I reached out and did

9   speak with Ms. Ferrell, Wendy, on occasion to try to get

10  some information.  She wouldn't give me information

11  about where Juan Carlos was, but she could tell me that

12  they were working to resolve the matter through the

13  court.

14       Q.   Okay.  And by the way, Ms. Ferrell was a

15  licensed attorney, correct?

16       A.   She is.

17       Q.   She is a licensed attorney.  And did you also

18  speak with Ms. Ferrell's father, David Ferrell?

19       A.   I did.

20       Q.   And he is also a licensed attorney; is that

21  correct?

22       A.   Yes, ma'am.

23       Q.   And basically, they related to you that they

24  were trying to work it out through the family court; is

25  that correct?

1     A.   Correct.

2     Q.   Was that successful?

3     A.   No.

4     Q.   What is the next thing that happened with

5   regard to your involvement and the FBI's involvement in

6   the case?

7     A.   The next matter that occurred was in

8   approximately July -- what was in July 2005 that Olga

9   Ruffier reported back to me that she had learned that

10  Juan Carlos and the child were living in Buenos Aires,

11  Argentina.

12    Q.   Okay.  And had -- did Olga indicate to you that

13  she had hired a private investigator?

14    A.   She did.  She hired a private investigator in

15  El Paso to look for Juan Carlos and the child.  They

16  were unsuccessful in finding him.

17    Q.   Well, then, how did she learn that Juan Carlos

18  and the child were residing in Argentina?

19    A.   She had communications with a cousin of

20  Mr. Ruffier's who lived in Buenos Aires who reported to

21  her that both the child and Mr. Ruffier were in Buenos

22  Aires.

23    Q.   And again, at some point in time, when Wendy

24  Ferrell did start cooperating with the FBI and others,

25  did you determine or did you receive information that

1  Juan Carlos Ruffier made any threat with regard to his

2  own cousin?

3      A.   Yes.

4      Q.   What did you learn?

5      A.   He said something to the effect that he was

6  going to kill her as well, that if she had provided

7  information to Olga, that he would kill her as well.

8      Q.   So Olga came to you and informed you that he --

9  she had learned, through the defendant's cousin, that he

10 was in Argentina with the baby; is that correct?

11     A.   Yes, ma'am.

12     Q.   What did you do next?

13     A.   I verified the information.  I checked with the

14 United States Department of State entry records and did

15 verify the fact that in May of 2005, the defendant did

16 enter the country of Argentina, Buenos Aires.

17     Q.   Okay.  And then what did you do?

18     A.   I obtained a yellow notice, which was an

19 Interpol yellow notice, which is an attempt to locate

20 the child.  In that case, we didn't have any federal

21 charges at that time, so the effort was to locate the

22 child outside the country.

23     Q.   So a yellow notice, is -- in Interpol, is that

24 the child is missing; is that correct?

25     A.   Correct.

1    Q.   Okay.  But you -- you had not yet -- you didn't

2  have charges here in El Paso, so you did not yet input a

3  red notice; is that right?

4    A.   That is correct, ma'am.

5    Q.   Okay.  What happened next?

6    A.   So the next step in the process is, then, in

7  September of 2005, Olga Ruffier contacted me and told me

8  it was her intent to travel to Buenos Aires in an effort

9  to locate Juan Carlos and Jonathan.

10    Q.   And what did you advise her?

11    A.   It was up to her, that if she was going to go,

12  that was her choice.  I just made arrangements to notify

13  our legal attache of her travel.

14    Q.   Okay.  And what happened next?

15    A.   So she did, in fact, go down there.  She hired

16  a private investigator.  They searched around looking

17  for Juan Carlos, the child, but were unsuccessful in

18  finding them.  While she was there, though, she also

19  reached out to an attorney and was able to file

20  kidnapping charges for the defendant in Argentina based

21  on the -- based on the taking of the child.

22    Q.   Did you later determine that Juan Carlos

23  learned that those charges had been filed against him?

24    A.   Yes, ma'am.

25    Q.   And what did he do when he learned charges had

1   been filed against him in Argentina?

2       A.   So Wendy told me that he, quote, freaked out

3   when he found out that Olga was in Buenos Aires looking

4   for him, and he fled to Paraguay; that he snuck across

5   the border and was hiding in Paraguay with the child to

6   prevent her from finding -- Olga from finding him.

7       Q.   Okay.  And, now, let me go back and talk a

8   little bit about the evidence in this case.  During his

9   flight, from the time that he went to Argentina, was --

10  did he stay in communications with Wendy Ferrell?

11      A.   He did.

12      Q.   And how were those communications held?

13      A.   So they were -- they were telephonic.  They

14  were via text messages.  They were via emails.  He left

15  a number of voicemail's.

16      Q.   And those that were memorialized, either by

17  emails, text messaging, voice -- or voicemail's, were

18  those tendered to you by Wendy Ferrell?

19      A.   They were.

20      Q.   And in addition to that, did Wendy Ferrell on

21  her -- on her own, not at the instance of the FBI, also

22  record some of the telephone conversations?

23      A.   She did.

24      Q.   Okay.  And are those part of the evidence in

25  this case?

1    A.   They are.

2    Q.   Okay.  And have you reviewed those?

3    A.   I have.

4    Q.   I know this is 12 years old.  But did you go

5    back and -- and review them for your testimony today?

6    A.   Yes, ma'am, I did.

7    Q.   Okay.  Now, with regard to the flight to

8    Paraguay, did he -- were there any text messages that --

9    where he admitted that he had -- was living in the

10   jungle of Paraguay with a child?

11   A.   There were text messages before that he had

12   been living in the jungle in Argentina.  I don't

13   remember that.  What I do know is that Wendy had sent

14   money and the family had sent money, and we did verify

15   that money had been sent to Juan Carlos under an alias

16   name, in both Ascension and I believe San Pablo.

17   Q.   I'm sorry.  Are those are Paraguay or in

18   Argentina?

19   A.   Yes, ma'am, in Paraguay.

20   Q.   Okay.  And what happened when he was in

21   Paraguay?

22   A.   Well, at one point, in December, for an unknown

23   reason, Juan Carlos had checked himself into a hospital.

24   For some reason, the hospital had called police.  Police

25   went out there and checked him.  They discovered that he

1  had a kidnapping warrant out of Argentina and they

2  arrested him.

3      Q.   And when they arrested him, what happened to

4  the child?

5      A.   The child was not with him at the time.  The

6  Paraguay authorities went out and found the child and

7  they took the child into protective custody.

8      Q.   Okay.  Was the child then returned to Olga?

9      A.   That's correct.  Olga then was notified.  She

10  traveled to Paraguay.  A hearing was held, the child was

11  released to her, and she was also to return with the

12  child to the United States.

13     Q.   Count One of the indictment -- of the

14  indictment alleges a time frame from April 15th of 2005,

15  that was the date of the first visitation, is that

16  correct --

17     A.   Yes, ma'am.

18     Q.   -- when the child was not returned until

19  December 12th of 2005.  Was December 12th of 2005, the

20  date the Paraguayan authorities returned the child to

21  Olga?

22     A.   Yes, ma'am.

23     Q.   Okay.  Now, with regard to what happened next

24  regarding the detention hearing, did Wendy Ferrell

25  travel to Argentina to see the defendant?

1    A.   She did.   She went to Argentina from June 10th

2  to June 15th of 2005.

3    Q.   What was the purpose of her trip?

4    A.   She went down there to visit with him, to

5  support him, to provide him financial assistance in

6  locating an apartment, to help him -- helping him to get

7  set up down there.

8    Q.   Did she do that?

9    A.   She did.

10    Q.   And what happened while she was there?

11    A.   While she was there, one evening she had gone

12  out to an Internet cafe.   She had corresponded with her

13  father, David, via email.   David had said that it was

14  silly for Juan Carlos to continue to run, that he should

15  face the charges on this and resolve this issue.

16       Wendy went back and conveyed that information

17  to Juan Carlos and he physically assaulted her.   He

18  punched her in the face.   He choked her.   He pushed her

19  against the wall.

20       At one point, he went to a restroom and Wendy

21  decided to flee.   She was several floors up, and as she

22  ran down the stairs, she fell down a set of stairs.

23    Q.   By the way, was she in any particular physical

24  condition when this occurred?

25    A.   At that time, she was seven months' pregnant

1   with Mr. Ruffier's child.

2       Q.   Okay.  And then what happened after she fell

3   down the stairs?

4       A.   She finally got down to the first floor and an

5   unknown individual stepped out of an apartment.  She --

6   Wendy believed that the individual was a police officer

7   because he was armed.  The man took her into his

8   apartment, made arrangements to get her a cab, and she

9   went to the United States Embassy.

10      Q.   And from the United States Embassy, did she

11  return back to the United States?

12      A.   She did.  She talked to her father, got wired

13  money for a plane ticket, and went home.

14      Q.   Now, we talked a little bit about the

15  communications being in writing.  Did she have a laptop?

16      A.   She did.

17      Q.   And was she able to retrieve that laptop before

18  going back to the United States?

19      A.   Yes, ma'am.

20      Q.   And how was -- how did that occur?

21      A.   So the next day, before she left, she reached

22  out to the police.  She asked for assistance in

23  returning to the apartment so that she could recover her

24  laptop, as well as some clothing, that -- she had made

25  contact with Juan Carlos at that time.  The police went

1  out there, they obtained those items, gave them to her

2  before she departed.

3      Q.   The Argentinean police?

4      A.   Yes, ma'am.

5      Q.   And then she returned to the United States; is

6  that correct?

7      A.   She did.

8      Q.   During that time period -- by that time, had

9  the Assistant United States Attorney -- actually, she

10  was the Chief of the El Paso Division at the time,

11  Margaret Leachman, was who you were dealing with; is

12  that correct?

13      A.   Yes, ma'am.

14      Q.   Had she authorized the FBI to open a case?

15      A.   Yes.

16      Q.   Okay.  And was it already a federal -- a United

17  States warrant out for Juan Carlos Ruffier?

18      A.   In November, a criminal complaint was signed.

19      Q.   Okay.  So it hadn't been signed yet; is that

20  correct?

21      A.   At what time frame, ma'am?

22      Q.   We're talking about the time frame when --

23      A.   June?

24      Q.   -- Wendy Ferrell had gone to Argentina.

25      A.   It had not.

1    Q.   Okay.  So when she returned to the United

2  States, what happened?  Were you notified of any of

3  these events at the time?

4    A.   Not at the time, no, ma'am.

5    Q.   Okay.  How did it come about that a case was

6  opened and the FBI proceeded to -- to author a

7  complaint?

8    A.   So the initial complaint obviously made by Olga

9  back in April, we contacted a preliminary assessment at

10  that point to determine whether or not an international

11  criminal kidnapping had occurred.  In July, once Olga

12  reported that Juan Carlos and the child were in Buenos

13  Aires and I verified the information, I opened an

14  investigation.

15    Q.   Okay.  And you continued to investigate; is

16  that correct?

17    A.   That's right.

18    Q.   And then, in November, I said -- I -- I think

19  you said you wrote a complaint; is that correct?

20    A.   Yes, ma'am.

21    Q.   When did Wendy Ferrell begin cooperating with

22  the FBI?

23    A.   In November of 2005.

24    Q.   And did she provide you some of the -- the

25  texts and Instagram messages and emails at that time?

1    A.   Not at that time, no, ma'am.

2    Q.   At some time, did you begin communicating with

3  the defendant?

4    A.   I did.

5    Q.   How did that occur?

6    A.   Primarily through email communications with

7  him.

8    Q.   How -- how was it that you began communicating

9  with him?

10    A.   Well, specifically, there were some

11  communications back and forth trying to resolve the

12  issues with the -- the child in the recovery.

13  Mr. Ruffier was obviously concerned about the interest

14  of the child, that he wanted to have the

15  child evaluated.  And I was doing everything I could,

16  along with the CPS, to make -- to meet those needs.

17         If, you know, he was going to come back, meet

18  with Child Protective Services, have the

19  child evaluated, fairly necessary, you know, what he was

20  asking at that time.

21    Q.   Okay.  So -- so he evidenced a concerned about

22  the safety of his child; is that correct?

23    A.   He did.

24    Q.   Okay.  And first of all, did Wendy tell you

25  that she -- she was an attorney, right? -- that she

1   authored a resolution in that regard to him?

2      A.   She did.

3      Q.   Even before he left the United States?

4      A.   That's correct, ma'am.

5      Q.   What did she author to the defendant so assuage

6   his concerns about the -- the abuse he might have

7   suspected?

8      A.   She was making arrangements with an individual

9   who was a specialist in evaluating children, to have the

10  child interviewed, to get information and to assess the

11  injury.

12     Q.   And how did the defendant take that?

13     A.   He had no interest in it.

14     Q.   And with regard to you, what did you offer him

15  when you were communicating with him on email?

16     A.   Again, that if the child were returned and

17  there were issues, that we would have the child

18  forensically interviewed; that we would have the child

19  examined by CPS and determine that there were no issues

20  or concerns before the child was returned to the mother.

21     Q.   Okay.  And so you made a representation to him

22  that you would make sure that the child would be safe;

23  is that correct?

24     A.   Definitively, yes, ma'am.

25     Q.   And is that in writing?

1     A.   I don't know specifically that those are in

2  writing, but I -- I didn't review those emails.

3     Q.   Okay.  And -- and how did he respond to your

4  offer?

5     A.   He didn't respond to any of the offers.  He --

6  he had no interest.  Even though he would make demands

7  about something that he wanted, when someone would try

8  to offer those demands or, you know, meet those demands,

9  he had no interest.  He was not going to proceed by

10  bringing the child back.

11     Q.   What do you mean by he made many demands?  In

12  what manner did he communicate the demands?

13     A.   Well, at one time, there was -- there was an

14  email that came out where he had a list of 14 different

15  demands that he wanted for the return of the child.  You

16  know, some such as, you know, Judge Chew must be removed

17  from the case, all charges must be dropped, you know,

18  these sorts of things.  But those weren't necessarily

19  being entertained.  But he had a number of demands

20  across the period.

21     Q.   And did -- did you -- did you communicate with

22  him about those demands?

23     A.   The initial ones, yes, ma'am.  Prior to --

24  prior to our criminal complaint being issued, early on

25  in the game, to see if we could get the child back --

1     Q.   Okay.

2     A.   -- concerning CPS, the safety of the child,

3  those sorts of things.

4     Q.   Okay.  But when you tried to negotiate, there

5  was no response; is that correct?

6     A.   He just wasn't willing to bring the child back.

7  Nothing was going to meet his need.

8     Q.   Okay.  So now we're in November.  And what

9  happened?

10     A.   November 2005 is when the criminal complaint

11  was issued, and then December of 2005 is when Mr.

12  Ruffier was arrested.

13     Q.   I'm sorry?

14     A.   December of 2005, then, is when Mr. Ruffier was

15  arrested.

16     Q.   Okay.  In Paraguay?

17     A.   Yes, ma'am.

18     Q.   Okay.  At some point in time, was a red notice

19  filed with Interpol?

20     A.   So the Argentina authorities issued the red

21  notice.  I never did.

22     Q.   Oh, okay.  And was that still pending when he

23  was arrested here in the United States?

24     A.   Well, they executed the red notice in Paraguay

25  for the Argentinian charges, and then he was returned to

1   Argentina to face those charges.  So that was, you know,

2   dismissed.  But the only thing that we had at that time

3   in the United States was the criminal complaint, and a

4   red notice was not filed.

5       Q.   Was the criminal complaint in the United States

6   sealed?

7       A.   Yes, ma'am.

8       Q.   So there would be no way that anyone would know

9   what the charges were?

10      A.   Correct.

11      Q.   Okay.  And with regard to the indictment, Count

12  Two of the indictment alleges that on February 3rd,

13  2006, he transmitted in interstate and foreign commerce

14  from El Paso -- I mean, from Argentina to El Paso, a

15  text message containing a threat to injure you.  Could

16  you please tell the Court about that.

17      A.   So that was an exchange of text messages

18  between Wendy and Juan Carlos.  During the course of

19  that conversation, this was on February 3rd of 2006,

20  there was some texts back and forth, and Juan Carlos

21  said, "I swear I could kill."  Then he said, "I want

22  Rankin's head."  Then he said, "I will have it."

23      Q.   Okay.  And with regard to Count Number Three,

24  February 3rd, 2006, he threatened to assault and murder

25  you.  Could you tell the Court about that.

1     A.   It was the same thing, ma'am.  Again, that he

2   said that he could kill, that he wanted my head, and

3   that he would have it.

4     Q.   Okay.  And Count Number Four, May 26th of 2006,

5   in interstate and foreign message from Argentina to El

6   Paso with Wendy, a telephonic communication contained --

7   threatening to injure Wendy.  Could you tell the Court

8   about that.

9     A.   So there were a number of them, ma'am.  There

10   were a number of threats came across.  What happened is,

11   as things went along, Juan Carlos started to realize

12   that Wendy provided information after November, he began

13   to threaten her.  So there were a series of those.

14     Q.   We -- we -- the indictment is -- does it

15   reflect all of the threats?

16     A.   No, ma'am.

17     Q.   Were there many, many more threats than what

18   are reflected in the indictment?

19     A.   Yes, ma'am.

20     Q.   In writing?

21     A.   Yes, ma'am.

22     Q.   And so can you tell the -- the Court, were

23   they -- just plain English.

24     A.   No, ma'am.

25     Q.   Well, explain the nature of the threats.

1    A.   So the threats themselves were graphic.

2  There's a lot of foul language.  There's a lot of really

3  aggressive threats.

4    Q.   Give -- give the Court some examples of some of

5  the threats that are in writing, and you need to --

6         You took some notes.  Do you need to refer to

7  your notes to refresh your memory?

8    A.   Just for these, ma'am, because I want to make

9  sure that I have them verbatim.

10    Q.   Okay.  And I understand that you said they are

11  very graphic.

12         MS. KANOF:  May he have permission, Your Honor,

13  to testify to the graphic nature?

14         THE COURT:  Yes, that's fine.

15    Q.   (BY MS. KANOF)  Go ahead.

16    A.   Thank you, ma'am.

17         So in a recorded conversation on April 5th of

18  2006 between Juan Carlos Ruffier and Wendy, Juan Carlos

19  said, "Yeah, I hope to God I don't find out anything

20  about you."

21         And Wendy said, "What's that supposed to mean?"

22         He said, "Well, that would make me very upset

23  you."

24         In that same conversation, he said, "If I had

25  clear accusation, if I knew you turned me in for

1   something, I would just blow your fucking head off."

2       Q.   Okay.  Go ahead.  There are other specific

3   examples that you noted.

4       A.   Yes, ma'am.  So on April 29th of 2006, there

5   was a series of voicemail messages that Juan Carlos had

6   left.  What he would typically do is he would call.  He

7   would leave a voicemail message until the recording

8   ended.  It would only take, you know, so much time, and

9   he would call back a number of times.  On that day,

10  April 29th, 2006, he did that.

11          When he started out, he said, in one of the

12  voicemail messages, that "If they subpoena me and they

13  subpoena you, we're going to war."

14          Then he called back again, he said, "And I

15  found out that all you were was a snitch.  That's what

16  you are.  You and your father are snitches.  I'm coming

17  after you hard.  Get ready."

18          And in a subsequent voicemail, he said, "Well,

19  now I know that you've been working with the FBI because

20  the information they got could only have come you.  Now

21  you're going to pay for it."

22          On April 30th, the next day, 2006, again, a

23  series of voicemail messages, he said, "I'm going to

24  file a motion to ruin you and your dad.  You're a piece

25  of trash.  Called the state bar, filed a suit against

1   you and grievances against you."

2          And then, around May 2nd, 2006, in a voicemail

3   message, he said, "And one more thing, stay the fuck out

4   of mine and Jonathan's deal, because if you get

5   involved, Wendy, we're going to have bigger problems

6   than you can comprehend.  Take that however you want.

7   Don't fuck with Jonathan, period.  Don't even get

8   involved.  Don't even open your fucking mouth about

9   anything.  Don't say shit.  I'm going -- I'm going to

10  make it real clear to you because I'm not scared of you,

11  you little fucking piece of shit.  And you can take this

12  to the FBI and you can have them do whatever the fuck

13  they want, all right?  But I'm going to get out of jail,

14  bitch, eventually.  You're very -- you're very doing the

15  wrong thing."

16      Q.   Agent Rankin, what would "war" -- where it says

17  "we're going to war," is that a theme in several of the

18  messages that he either wrote or left?

19      A.   Yes, ma'am.

20      Q.   Okay.  Let me take you to the present.  Were

21  there many attempts to either unseal the complaint or

22  unseal the indictment prior to the defendant

23  surrendering himself?

24      A.   Yes, ma'am.

25      Q.   Both on the part of his counsel and in

1    Argentina, as well as in the United States?

2         A.   That's correct, yes, ma'am.

3         Q.   And, of course, we never asked the Court to

4    unseal it, correct?

5         A.   Correct.

6         Q.   When -- you're not the case agent anymore

7    because you're not here, right?

8         A.   Correct.

9         Q.   There are local case agents; is that right?

10        A.   There are.

11        Q.   After the defendant came to the bridge a week

12   ago, Wednesday, I think it was, the 7th of March, I'm

13   not sure -- it was a Monday -- he was first processed by

14   CBP, correct, that you know?

15        A.   Yes, ma'am, I believe.  I wasn't present for

16   the arrest.

17        Q.   I know.  Okay.  But when he -- when he was

18   turned over to the FBI, is that the first time that he

19   was finally arrested on the outstanding warrants?

20        A.   Yes, ma'am.

21        Q.   Okay.  And after he was arrested, he went into

22   the custody of the FBI, correct?

23        A.   Yes, ma'am.

24        Q.   And was that the first time he learned that he

25   was charged with something other than the parental

1  kidnapping?

2      A.   It is, yes, ma'am.

3      Q.   And did he say, "I'm fucked"?

4      A.   He did.

5      Q.   When he came and surrendered, based on the

6  communications that he had had with the government, both

7  internationally and with your office and my office, did

8  it appear that he only thought he was charged with the

9  kidnapping?

10      A.   That's correct, yes, ma'am.

11      Q.   Now, with regard to this theme about war, you

12  said that throughout the written and oral communications

13  that you received as part of the evidence, that that was

14  a theme; is that correct?

15      A.   It is, yes, ma'am.

16      Q.   Periodically, have you reviewed the open

17  portion of his Facebook page?

18      A.   I have.

19      Q.   Obviously, you're not -- you haven't friended

20  him and he hasn't friended you?

21      A.   That's correct.  Yes, ma'am.

22      Q.   Okay.  With regard to the part that's open to

23  the public, did you view a communication on his Facebook

24  page the day before he surrendered himself last week?

25      A.   Yes, ma'am, I did.

1     Q.   What did it say?

2     A.   Essentially, that it's time to go to war.

3   Let's go to war.

4     Q.   So that theme that he communicated to Wendy

5   about going to war and if I ever find out that you

6   cooperated with the FBI, that theme is still current as

7   of last week?

8     A.   Yes, ma'am, very much so.

9     Q.   That attitude has not changed?

10    A.   No.

11    Q.   Now, with regard to travel, in addition to

12  Argentina and Paraguay, what other foreign countries are

13  you aware of that the defendant has freely traveled to

14  and from?

15    A.   I know that he was in Russia at one time.

16    Q.   Okay.

17    A.   Argentina, Paraguay, is what I'm familiar with.

18    Q.   What about Mexico?

19    A.   Certainly, ma'am.  Yes, he was in Mexico when

20  he had told me that he had initially fled to Juarez and

21  that he was in Mexico City.  And obviously when he came

22  back this time, he traveled back up through Mexico.

23    Q.   In looking -- periodically, looking at his

24  Facebook page, did -- did you see any pictures of him in

25  Mexico?

1    A.    Yes, ma'am.   There were pic- --

2    Q.    Who -- who was he with in Mexico?

3    A.    So he was with a woman that has been described

4    as his defense attorney from Argentina.

5    Q.    And --

6    A.    And -- and the child, Jonathan.

7    Q.    Okay.  And you're a law enforcement officer for

8    like 30 years, right?  If you include your CID time and

9    your El Paso Police Department time.

10          And the appearance of the pictures, in your

11   opinion, were they more than a defense attorney/client

12   relationship.

13   A.    Yes, ma'am.

14   Q.    What did it appear to you?

15   A.    Appeared to be a personal relationship.

16   Q.    Okay.  In Mexico?

17   A.    Yes, ma'am.

18   Q.    Did you also look at the Facebook page of the

19   woman?  By the way, I believe her name is Marissa

20   Gonzalez; is that correct?

21   A.    That is correct.  Yes, ma'am.

22   Q.    Did you also view her Facebook page?

23   A.    I did.

24   Q.    And what did you find there?

25   A.    That she was making comments about the hearing

1   that had occurred the previous week.

2        Q.   Okay.  And professional attorney-like comments?

3        A.   Certainly not.

4        Q.   Okay.  With regard to his son's citizenship, do

5   you know what country his son is a citizen in?

6        A.   Argentina.

7        Q.   Okay.  His son is not a United States citizen,

8   correct?

9        A.   No.

10       Q.   Okay.  Not a naturalized citizen, not a LPR --

11  not a legal permanent resident?

12       A.   Correct.  That's correct, ma'am.

13       Q.   Okay.  With regard to employment, before the

14  defendant left El Paso with his son, how was he

15  employed?

16       A.   Well, at one time, he worked for Wendy's law

17  firm.  But other than that, I don't know of any

18  employment that he had.

19       Q.   Well, he's alleged to have made threats in the

20  indictment to injure her livelihood.  What evidence do

21  you have of that?

22       A.   There are recordings, both voicemails where he

23  said that he was going to -- to contact her clients and

24  he was going to tell them what a horrible lawyer she

25  was.  He was going to file complaints with the bar, have

1    grievances against her, things of that nature.

2         Q.   Did he have access to most of her clients so

3    that he could do that?

4         A.   Certainly, because he worked in the law office

5    at one time.

6         Q.   Okay.  And Wendy's father, did he ever threaten

7    her -- him?

8         A.   He did.

9         Q.   How did those threats occur and where did they

10   occur?

11        A.   Well, in one particular voicemail -- I have one

12   from June 25th of 2006, if you would like that.

13        Q.   I'm sorry?

14        A.   The content from that.

15        Q.   Yes.

16        A.   Juan Carlos left a voicemail message for David

17   Ferrell, and he said, "If you fuck with me, I'm going to

18   fuck with you.  I'm ready to start a war with you.  I

19   will take you and your family out, with or against the

20   law."

21        Q.   Now, you testified that Wendy went to

22   Argentina.  The time that she was assaulted, she was

23   seven months' pregnant; is that correct?

24        A.   That is correct.

25        Q.   Did she have that child?

1     A.   That child was born on August 8th of 2005.

2     Q.   Okay.  And that child is now approximately 12

3  years old; is that correct?

4     A.   That's correct, yes, ma'am.

5     Q.   Has the defendant made any threats with regard

6  to that child?

7     A.   So early on, in December of 2005, that's when

8  Wendy initially came to us because Juan Carlos had made

9  a statement to her that he said, "Look what I've done to

10  one little boy for eight months.  You're just across the

11  border."  Wendy was fearful that Juan Carlos was going

12  to come over, abduct that child, and take that one as

13  well.

14     Q.   Okay.  Have there been any other communications

15  with regard to that child?

16     A.   Between the two?  No.  I know that Mr. Ruffier

17  had made some attempt through the State Department,

18  through the Hague Convention, to try to reach out to

19  establish contact, but Mr. -- or Wendy had no interest.

20     Q.   Is Ms. Ferrell in fear today?

21     A.   Very much so.

22     Q.   As a result of the emotional trauma that was

23  caused in Ms. Ferrell, did she reach out, with the

24  assistance of the FBI victim's specialist, to obtain

25  funds from the Texas Crime Victims -- through the Texas

1    Crime Victims Act to obtain funds to relocate?

2        A.   That's correct.  Yes, ma'am.

3        Q.   And did she, in fact, change her identity and

4    relocate?

5        A.   She did.

6            MS. KANOF:  May I have a moment, Your Honor?

7            THE COURT:  Yes.

8        Q.   (BY MS. KANOF)  Other than the visitation from

9    the morning of the 15th to 4 -- well, to 5:00, because

10   it was extended by Wendy Ferrell to 5:00 in the evening

11   of the 15th of April of 2005 until the 15th of December

12   of 2005, did Olga Ruffier give the defendant permission

13   to take her son and flee with him anywhere, including

14   Argentina?

15       A.   No, ma'am.

16           MS. KANOF:  Your Honor, we would ask that the

17   Court follow the recommendation of pretrial services

18   with regard to this case.

19           THE COURT:  All right.

20           MS. KANOF:  Pass the witness.

21           THE COURT:  We're going to take a brief recess

22   right now.

23           (Recess taken from 11:56 a.m. to 12:04 p.m.)

24           THE COURT:  Good afternoon.  Please be seated.

25           We're back on the record in EP:06-1261.

1          Mr. Acosta, please proceed.

2          MR. ACOSTA:  Thank you, Your Honor.  May it

3 please the Court.

4          THE COURT:  Thank you.

5                    CROSS-EXAMINATION

6 BY MR. ACOSTA:

7     Q.   Agent Rankin -- it's agent, right?

8     A.   Yes, sir.  Rankin.

9     Q.   Am I pronouncing that correct?  Rankin?

10     A.   Rankin, yes, sir.

11     Q.   Thank you.

12          Agent Rankin, if you don't understand one my

13 questions, just ask me to repeat, I'll try to repeat it

14 or clarify the question.  Is that -- is that okay?

15     A.   Thank you, sir.  Yes.

16     Q.   And, Agent Rankin, you mentioned that -- the

17 last thing you mentioned to the prosecutor was about

18 Wendy Ferrell having a different identity at this point,

19 correct?

20     A.   By different identity --

21     Q.   Wasn't that what the prosecutor said, that she

22 had to change her identity?

23     A.   No.  So she's not using the name Ruffier, but

24 she's still going by Wendy Ferrell, last I knew.

25     Q.   Okay.  So she didn't have to change her

1   identity.  That would be incorrect?

2      A.  No.  She relocated from the area.  The Texas

3   Crime Victims Compensation Act assisted with that.

4   She's not longer using that name, but she's still using

5   the name Ferrell.  It wasn't a total name change.

6      Q.  All right.  And also, as you mentioned, she's

7   no longer in this jurisdiction, correct?

8      A.  That is correct, yes, sir.

9      Q.  And her whereabouts are only known to law

10  enforcement agencies right now, correct?

11     A.  They are known to me, sir.  I hope they are not

12  known to other people, yes.

13     Q.  I'm sorry?

14     A.  I would hope that they are not known to other

15  people, sir, but we have not disclosed that information.

16     Q.  Okay.  Well, let me get some clarification and

17  some dates.  I know that you went over some dates with

18  the prosecutor.  What was the date that the kidnapping

19  charge was filed?

20     A.  The criminal complaint for the United States?

21     Q.  Yes.

22     A.  November of 2005, sir.

23     Q.  What is the date of the threats -- when were

24  those filed?

25     A.  So the threats extended for a period, probably

1   starting in December of 2005, running all the way

2   through May of 2006.

3       Q.   And would it be fair to say that after May

4   2006, the threat -- those threats were over, correct?

5       A.   That I have documented threats, yes, sir.

6       Q.   Other than that, there is no other thing that

7   happened last year, the year before last, correct?

8       A.   That is correct.

9       Q.   Well, as to regard of the threats -- and I'm

10  going to just bunch them all together and you can

11  separate them if we have to.  But isn't it true that the

12  threats were by -- by email, you said?

13      A.   They came through different mechanisms, sir.

14  Some could have been through email, others through

15  recorded telephone conversations, some through voicemail

16  messages that were left on the phone.

17      Q.   Okay.  Now, let's talk about the ones that are

18  supposed to be against you or -- or the threats that

19  were made against you supposedly.  Were those recorded?

20      A.   Well, it's recorded in writing, sir, as a

21  series of text messages, so yes.

22      Q.   When you say "text message," and I'm trying to

23  think back 12 years ago, maybe the technology was not

24  the same as we have right now.  When you say "text

25  message," you mean like somebody on the phone putting a

1    little text on it?

2        A.   No.   On the computer, sir.   Exchanges of

3    messages back and forth, like an online message chat,

4    maybe you could call it.

5        Q.   Okay.   So it's a computer message that's going

6    back and forth.   And the hard drive of those computers

7    have been preserved?

8        A.   I have the written, printed-out text message,

9    sir.   I don't believe that there are hard drives that

10   are preserved.

11       Q.   Okay.   So it's -- it's the -- the -- whatever

12   it was [indiscernible], it got printed by you?

13       A.   It got printed by Wendy.   It was given to me.

14       Q.   Okay.   Now, let's concentrate first on -- on

15   the threats against you, supposedly, yes?   The ones that

16   are made against the FBI agent, which is you, right?

17   You received threats, right, supposedly?

18       A.   That I did talk about, yes, sir.

19       Q.   And those are the ones that are in one of the

20   counts, correct?

21       A.   Correct.

22       Q.   Those are the ones I want to focus.   How were

23   those threats made?

24       A.   They were made through that chat -- that

25   messaging that we spoke about, sir.

1      Q.   Which is at the computer, correct?

2      A.   The chat or the text messaging, whatever you

3  want to call it, and that there was a series of chats

4  going first.  And I had testified, sir, that back on

5  February 3rd of 2006, there was a communication between

6  the defendant, Juan Carlos, and between Wendy.  And

7  during the course of that conversation, he had said that

8  he sweared that he could kill, that he wanted my head

9  and that he would have it.

10     Q.   Now, was that he wants your head and he can

11 have it, the meaning of that was explained by -- by

12 Mr. Ruffier at any point?

13     A.   No, sir.

14     Q.   Okay.  That was said?

15     A.   I never spoke with Mr. Ruffier about this.

16 That -- from what I took from it right there is that he

17 wanted my head.  He wanted to kill me.

18     Q.   Okay.  So that's your interpretation of that

19 message, correct?

20     A.   It is.

21     Q.   Okay.  So that message was not directly said to

22 you?

23     A.   It was not.

24     Q.   It was said to Ms. Ferrell, saying that he was

25 upset with you and wanted your head, supposedly?  Yes?

1      A.   No.  It's there, yes, sir.

2      Q.   And she's the one who printed out that message

3   and gave it to you?

4      A.   That is correct, sir.

5      Q.   Do you remember when she gave you that message?

6      A.   I don't, sir.  I could refer.  Certainly, there

7   is a report that would indicate that information.   I

8   don't have that for you today.

9      Q.   Did she give it to you immediately when she

10   received the message?

11      A.   No.

12      Q.   How many months went by before she gave you

13   that message?

14      A.   I don't know when it was, sir.  I don't believe

15   it would have been a period of months.  I would believe

16   it would have been a period of days.

17      Q.   Then, we have -- were there any other threats

18   to you where he wants your head or to harm you in any

19   other way, other than that one that we talked about?

20      A.   Not that I'm aware of, no, sir.

21      Q.   And there were no direct threats to you,

22   correct, other than that one that you already testified

23   to?  He didn't call you on the phone or message you on

24   the computer, saying, "I'm going to kill you,

25   Mr. Agent," or anything like that, correct?

1     A.   That is correct, sir.

2     Q.   Okay.  So everything is coming from Ms.

3 Ferrell, his ex-wife, correct?

4     A.   Yes.

5     Q.   The threats against you and the threats against

6 her, they are all coming from her, yes?

7     A.   Yes, sir.

8     Q.   Okay.  So let's mention about the those

9 threats.  We have several counts on that, correct?

10     A.   We do.

11     Q.   And are those threats -- and I'll do the same

12 thing.  Are those threats also on the text messaging

13 thing?

14     A.   No, sir.  Again, as I testified, that they were

15 either a voicemail message that Mr. Ruffier had left on

16 Wendy's phone.  They were a recorded conversation that

17 she had made -- that Wendy had made between herself and

18 the defendant or they were emails.

19     Q.   Okay.  So when you mentioned that it's on the

20 voicemail, are we talking about like a little table

21 [indiscernible] at home, and he says, "I'm going to

22 threaten your livelihood," or something?

23     A.   Yes, sir.

24     Q.   Is -- is that what we're talking about, a

25 little tape?

1      A.   I don't know if it's a little tape.  But a

2  tape-recording, yes, sir.

3      Q.   Or a big tape, I don't know.  But -- but that

4  it was a tape, correct?

5      A.   That is correct, sir.

6      Q.   And we have those tapes secured?

7      A.   We do.

8      Q.   And Ms. Ferrell is the one who provided those

9  tapes to you --

10      A.   She did.

11      Q.   -- right?

12      A.   Correct, yes, sir.

13      Q.   Okay.  Then you said there is also the text

14  communications that we've been talking about from the

15  computer, the computer texting?

16      A.   So I don't have other text messages for these

17  particular threats against Ms. Ferrell, or, I guess,

18  Wendy.  What I have are emails or again voicemail

19  messages, sir, or recorded telephone conversations.  The

20  text messages were specific to -- or this chat was

21  specific to the threat against me.

22      Q.   Okay.  So we have emails, [indiscernible]

23  emails back in 2005 or 2006; is that correct?

24      A.   Again, one of the three that I had mentioned,

25  yes, sir.  But e-mails, yes.

1    Q.   So supposedly he communicated the threats

2 through an email saying, "I'm going to hurt you because

3 you were snitching on me," is what supposedly the

4 e-mails say?

5    A.   Well, the ones that I testified to, sir, were

6 specifically voicemail messages and recorded telephone

7 conversations.  I don't have the emails with me that I

8 pulled out [indiscernible], specific what those -- those

9 statements were.  But I -- as I recall, there were

10 certainly threats within email messages.

11    Q.   Okay.  Now, let's move to the recorded

12 communications.  And when you mean "recorded

13 communications," just so we understand, that's

14 supposedly Mr. Ruffier calling Ms. Ferrell, correct, on

15 the phone?

16    A.   Yes, sir.

17    Q.   And she attaching some type of device to record

18 him?

19    A.   That's correct, sir.

20    Q.   Now, there is some law on who can record

21 somebody, right?  Isn't there some sort of law as to who

22 can record somebody while talking to -- to that person?

23    A.   Well, certainly, sir.

24    Q.   And did Ms. Ferrell inform Mr. Ruffier that the

25 communications were going to be recorded?

1      A.   I don't believe so, no, sir.

2      Q.   Okay.  Did she tell you that she informed Mr.

3 Ruffier that all her communications were going to be

4 recorded to him?

5      A.   She did not say that to me, no, sir.

6      Q.   Did you advise Ms. Ruffier to -- Ms. Ferrell,

7 to record those communications [indiscernible]?

8           MS. KANOF:  Your Honor, I object.  There is

9 nothing wrong in the state of Texas of a wife recording

10 a husband on the telephone.

11          THE COURT:  Overruled.

12     Q.   (BY MR. ACOSTA)  Sir, did you recommend to Ms.

13 Ferrell to record communications with Mr. Ruffier?

14     A.   I did not.

15     Q.   Did anybody in the FBI or U.S. Attorney's

16 office recommend it to her that she should be recording

17 communications with Mr. Ruffier?

18     A.   No, sir.

19     Q.   That you know of, right?

20     A.   No.  I told her to preserve the voicemail

21 messages and things like that that she received and to

22 provide those to me, but I didn't specifically advise

23 her to conduct recorded telephone conversations with

24 Mr. Ruffier.

25     Q.   But she still did, right?

1    A.   She did.

2    Q.   And she provided those tapes, I guess?

3    A.   They are tapes, yes, sir.  She provided those

4  to me.

5    Q.   And do you have those tapes?

6    A.   I do.

7    Q.   Okay.  Well, after all this time, Mr. Ruffier

8  is in Argentina, correct?

9    A.   To the best of my knowledge, yes, sir.  He

10  remained in Buenos Aires.

11    Q.   And you would be able to know whether or not he

12  was from Argentina, because you did -- you did have some

13  type of Interpol notification that if he crosses

14  boundaries, somebody has to be advised, right?

15    A.   I did not, sir.  What I had at the time was a

16  yellow notice that had been issued for the child,

17  looking for the child.  It wasn't until November of 2005

18  that I had charges in the United States on Mr. Ruffier,

19  and so a red notice had not been filed.  So that was not

20  actually the case at the time.

21    Q.   Okay.  But I'm a little bit confused now

22  because you were talking about 2005.  We're talking

23  about those threats that were communicated from

24  [indiscernible] all the way to El Paso.  At the point

25  the threats are communicated, you already had the -- the

1  indictment in this case, correct?

2       A.   No.

3       Q.   When did the indictment on the kidnapping was

4  filed?

5       A.   June of 2006.

6       Q.   And the threats happened on what date?

7       A.   Again, sir, the threats were approximately

8  December of 2005 through June of 2006.

9       Q.   At what point do you finally put a notice to

10 Interpol to notify you and notifing them that you have

11 charges against this person?

12      A.   I did not.

13      Q.   You never had put anything on Interpol?

14      A.   I've never filed a red notice on Mr. Ruffier

15 based on the criminal complaint or the indictment in the

16 United States.

17      Q.   What about a yellow notice?

18      A.   There was no need for it because the child had

19 been recovered in December of 2005.  It had been

20 returned to the mother.  So that yellow was not

21 necessary any more.

22      Q.   Now, when -- are you the one who testified at

23 the grand jury for the kidnapping?

24      A.   I am, sir.

25      Q.   Okay.  Did you inform the grand jury that the

1  Eighth Circuit Court of Appeals had basically overturned

2  Judge Chew's orders?

3       A.   I did not, sir.  No.

4       Q.   Did you not mention that to the grand jury?

5       A.   No.  But I didn't have that information at the

6  time it either, sir.  And I don't believe, as far as the

7  time line is concerned, at the time I went to grand jury

8  that that happened.  If it had, I wasn't aware of it.

9       Q.   Well, but if it had, you should have been

10 aware, right?  You are the case agent assigned to this

11 case?

12      A.   Not necessarily, no, sir.

13      Q.   You -- did you contact -- who was my client's

14 attorney at that time?

15      A.   I don't --

16      Q.   Was it still Ms. Ferrell?

17      A.   No, certainly not.

18      Q.   Well, because we mentioned that Ms. Ferrell is

19 an attorney, correct?

20      A.   She is, yes, sir.

21      Q.   Or was, I don't know.  But back in 2005, 2006,

22 she was an attorney, correct?

23      A.   She was, yes, sir.

24      Q.   And she was my client's attorney as well,

25 correct?

1    A.   Not as far as I was concerned, sir.  Not as far

2    as my dealings with her.  She didn't purport to be his

3    attorney for this matter when I engaged her.

4    Q.   And I am sorry.  Could you repeat that.  I -- I

5    don't -- I couldn't follow.

6    A.   So the answer to your question, sir, is that I

7    don't believe that she was his attorney for this matter

8    at that time.  Any dealing was with Cori Harbour at that

9    time, with Daisy Everhardt.  These were the people that

10   were representing him.  I think this Wendy had tried to

11   do something for him prior to that.  When I engaged her,

12   she was not acting -- or didn't report to me that she

13   was acting as his attorney.

14   Q.   And thus, she didn't tell you that she was the

15   attorney of Mr. Ruffier.  That's what you're trying to

16   tell me?

17   A.   At the time I engaged her, sir, she did not

18   tell me she was the attorney for Mr. Ruffier, correct,

19   sir.

20   Q.   Did she ever tell you when she stopped that

21   attorney/client representation at any point?

22   A.   No, sir.

23   Q.   Did you ever ask her?

24   A.   No, sir.

25   Q.   Now, you did mention to the prosecutor that one

1  of the very first things that Ms. Wendy Ferrell and

2  Mr. Ruffier did when they received that child back in

3  2005 -- in April 2005, I think you said, was that you

4  noticed some marks on his back, correct?

5      A.   So it wasn't initially when they received the

6  child.  It was approximately at 3:00 that afternoon.

7  And this was information that was provided to me by

8  Wendy.

9          But Wendy said that Juan Carlos had looked at

10 the child's back, that he had observed these two small

11 bruises, that he had spoken with the child in Russian,

12 and the Russian -- and the child had made some statement

13 about the bruises occurring from either the mother or

14 the mother's boyfriend.  Wendy didn't speak Russian, so

15 she had to take Juan Carlos's word on that.  But that's

16 what had occurred later in that day, sir.

17     Q.   And they made -- the informed the El Paso

18 Police Department, correct?

19     A.   They took the child to the El Paso Police

20 Department and made a report, yes, sir, that same day.

21     Q.   And there were photos, I imagine, at El Paso

22 Police Department.  Do you have those photos?

23     A.   I don't have the photos with me, sir, no.  But

24 I know that photographs were taken of the injuries, yes,

25 sir.

1      Q.   Now, one of the things that I think you

2  mentioned was that -- was the child in custody of the

3  United States in Paraguay, right?  Wasn't the consulate

4  involved in Paraguay to -- to recover the child as well?

5      A.   So I wasn't there, sir.  I do know that Ms. --

6  when Olga went down there, that there was a hearing that

7  was held and that they did release the child to the

8  mother.  They released Jonathan to Olga at that time,

9  and she was allowed to return to the United States.

10      Q.   Now, the communications where my client is

11  asking you, "Can you please make sure my child is okay

12  because of those allegations," those communications went

13  directly to you, correct?

14      A.   During what time frame, sir?

15      Q.   After the child is recovered by Olga Ruffier.

16      A.   So I don't remember that, sir, but there may

17  have been a series of emails that came back and forth

18  from Ms. Ruffier to me concerning the child, yes, sir.

19      Q.   And did you move -- or did anything with CPS or

20  El Paso Police Department to ensure the safety of that

21  child?

22      A.   Now, you're going to have to repeat your

23  question, sir.  I don't understand.

24      Q.   Well, once you received those communications

25  saying, "Please make sure my child is okay," did you do

1   anything with El Paso Police Department, child

2   Protective Services or any other agency, to ensure that

3   that child was going to be safe?

4        A.   So the time frame was different, sir.  This was

5   early on during April of 2005, initially, when we had

6   those communications.  After the fact, when the child

7   was recovered in December of 2005, Olga returned with

8   the child to South Carolina.  She wasn't here in El Paso

9   at that point either.  So the El Paso Police Department

10  nor Child Protective Services in Texas were engaged at

11  that point.

12       Q.   Okay.  Thank you for clarifying.  Now, at some

13  point, did you reach out to North Carolina Police

14  Department or Child Protective Services in North

15  Carolina to ensure the safety of that child that has

16  been given to the mother, or no?

17       A.   It was South Carolina, sir.  And, no, I did

18  not.

19       Q.   You didn't follow through with the child safety

20  anymore?

21       A.   No, sir.  Because nine months had gone by.  The

22  Court had made the decision to release the child in

23  Paraguay to the mother.  The mother had taken custody of

24  him.

25       Q.   Do you who has custody of the child right now?

1        A.    I do.

2        Q.    Who is that?

3        A.    Well, I believe the child is staying with

4  family members here in El Paso, Texas.

5        Q.    But do you know who has legal custody of the

6  child?

7        A.    I believe that Ms. Ruffier does.

8        Q.    And that legal custody was given by the

9  Argentina courts, correct?

10       A.    I don't know that it was given by the Argentine

11 courts.   I didn't review that information, sir.   But

12 it's possible.

13       Q.    Well, let me focus your attention about an

14 alleged attack or an assault -- family violence assault

15 that happened in Argentina.   Did the U.S. Embassy get

16 involved in Argentina or the U.S. Consulate got involved

17 in Argentina regarding this assault that you were

18 talking about, with -- with Ms. Wendy Ferrell?

19       A.    You're referring to the June 2005 time frame,

20 the 10th through the 15th, when Wendy traveled to

21 Argentina, sir?

22       Q.    I think that's the only assault, right?   That's

23 the only assault you talked about, right?

24       A.    Yes, sir.

25       Q.    That's what I'm referring to.

1      A.   Okay.   And your question, sir, was the embassy

2  involved?

3      Q.   Yes.

4      A.   Ms. Ferrell went to the embassy and sought

5  their assistance, yes, sir.

6      Q.   So we have photographs of the alleged injuries

7  or video of any type of alleged injuries, correct?

8      A.   So when Wendy returned to the United States,

9  she had her father take a photograph of her lip.   But

10  other injuries were not documented, no, sir.

11      Q.   So the U.S. Consulate or U.S. Embassy did not

12  see any injuries or didn't feel they had to take any

13  photographs of those injuries?

14      A.   So I don't know that that was their role, sir.

15  I don't know what they did, because I wasn't there.   But

16  what Wendy told me is that she was going to file

17  criminal charges in Argentina for the family violence

18  for the assault, but they told her it would take three

19  or four days for her to do that.   She made the decision

20  not do it because she just wanted to get out of there.

21  And so, as a result, she didn't file the charges.

22          When she returned home, she didn't tell her

23  father the entire story about what happened.   She didn't

24  want to disclose the nature of the assault to him, but

25  she did mention that she had been injured and he took a

1   picture of her lip.  But any other injuries to her body

2   at that time were not documented or photographed.

3       Q.   Now, you mentioned that she was pregnant,

4   right?

5       A.   She was.

6       Q.   And how -- how many months pregnant you said

7   she was?

8       A.   So my estimation was she was about seven

9   months' pregnant because this occurred June 10th through

10  the 15th of 2005, and the child was born August 8th of

11  2005.

12      Q.   So did Ms. Ferrell tell you that she made it to

13  her OB/GYN physician to check whether or not the child

14  was injured in any way after the attack?

15      A.   No, sir.

16      Q.   And there is no evidence about that, correct?

17      A.   Not that I'm aware of, no, sir.

18      Q.   What was the last communication you ever had

19  with Mr. Ruffier, that -- that -- the closest one to

20  today?

21      A.   The last thing I remember, sir, was the email

22  that I had sent him.  It probably was -- I'm going to

23  have to estimate, sir.  Maybe March or April of 2006

24  where I conveyed to him that I had monitored some

25  communications, that I had received information about

1    threats, that I advised him to not threaten witnesses,

2    not to intimidate people of that nature.  That was the

3    last communication I recall having with him.

4        Q.   And would that be correct also as to Wendy

5    Ferrell and Mr. Ruffier, last communications?

6        A.   Well, that I don't know, sir.  What I have

7    documented is through June of 2006.  I don't have

8    anything after that, sir.

9        Q.   Well, did you communicate it to an attorney,

10   Charles Kemp from D.C., that there were other charges

11   pending for Mr. Ruffier, not only the kidnapping case?

12       A.   So I don't remember if I told that to Mr. Kemp

13   or not.  Mr. Kemp made inquiries as to whether or not an

14   indictment existed against him.  I said, "Yes."  I told

15   him the indictment was sealed.  I don't recall saying

16   anything to him about other charges.

17       Q.   So it could happen, it could not have happened,

18   correct?

19       A.   I don't believe it happened, sir, but I can't

20   say definitively.

21       Q.   If I am incorrect, please correct me.  So it

22   would appear to me that Wendy Ferrell decides to move

23   from co-defendant to corroborator with you on December

24   of 2005?

25       A.   November.

1      Q.   November.  Is that when she comes back from

2  Argentina?

3      A.   No, sir.  She came back from Argentina in June.

4  We were making arrangements in an attempt to speak with

5  her.  One of the things that prohibited us from speaking

6  with her was the birth of the child.  The preference was

7  for her to have the child and then have some time.  And

8  later, after that, she sat down and spoke with us.

9      Q.   So it was November when she sat down with you?

10 When was it?

11     A.   2005.  Yes, sir.  November.

12     Q.   November 2005.

13          MR. ACOSTA:  May I have a second, Your Honor?

14          THE COURT:  Yes.

15          MR. ACOSTA:  Almost done, Your Honor.

16     Q.   (BY MR. ACOSTA)  Are you aware of the

17 communications between Mr. Kemp and my client about the

18 charges?

19     A.   No, sir.

20     Q.   And you've never talked to him about that --

21 about any communications with my client?

22     A.   No.  My conversation with Mr. Kemp was very

23 brief.

24          MR. ACOSTA:  Your Honor, I'll pass the witness

25 at this point.

1          THE COURT:  Ms. Kanof?

2          MS. KANOF:  Yes.  Just briefly.

3                    REDIRECT EXAMINATION

4   BY MS. KANOF:

5     Q.   Agent Rankin, you testified that Olga and the

6   defendant were married in 2001; is that correct?

7     A.   Yes, ma'am.

8     Q.   And when they were -- they were married in

9   Belorus, right?

10     A.   That's correct.

11     Q.   And they lived there for a short period of

12   time?

13     A.   Correct.

14     Q.   Then did they come to live with his parents in

15   El Paso?

16     A.   They did.

17     Q.   And at some point in time, did Olga Ruffier

18   call the police for domestic violence?

19     A.   She did.

20     Q.   Was she taken to the Transitional Living Center

21   here in El Paso with the child because of the domestic

22   violence?

23     A.   Yes, ma'am.

24     Q.   And then did she return to Russia with the

25   child because she was a victim of domestic violence at

1  the hands of the defendant?

2     A.   Yes, ma'am.

3     Q.   With regard to the defendant's freedom of

4  movement, does he have a United States passport?

5     A.   I don't believe he has a United States passport

6  right now.

7     Q.   Okay.  Did he seek a visa for his son?

8     A.   He did.

9     Q.   And what kind of visa did he seek?

10    A.   So he initially asked for a student visa for

11  the child to attend high school here.  Then my

12  understanding would be, in the records, that he actually

13  obtained that visa as well as a B1B2.

14    Q.   Okay.  And it doesn't expire until 2026; is

15  that correct?

16    A.   That's possible, ma'am.  I don't remember the

17  actual expiration date right now.

18    Q.   Okay.  At some point in time, did Olga

19  surrender the child to the defendant?

20    A.   That's my understanding, yes.

21    Q.   And has the defendant, to your knowledge, ever

22  held steady employment?

23    A.   No.  I'm not aware of any steady employment

24  that he's held.

25    Q.   No evidence of any steady income at any time?

1       A.   No, ma'am.

2       Q.   Do you know if he has a trade?

3       A.   So he alleges that he's a pilot, some sort of

4    pilot on his Facebook.   But I don't never have any

5    evidence of that either.

6            MS. KANOF:   Thank you.

7            THE COURT:   Mr. Acosta.

8            MR. ACOSTA:   Thank you, Your Honor.

9                         RECROSS EXAMINATION

10   BY MR. ACOSTA:

11      Q.   Now, you now mentioned an [indiscernible] case

12   regarding Olga.   What's her Russian last name?

13      A.   I couldn't -- [indiscernible].   I don't

14   remember.

15      Q.   All right.   Let's go to the very first wife,

16   Olga, right?

17      A.   I don't know if that's his first wife, sir --

18      Q.   Uh-huh.

19      A.   -- but the wife prior to Wendy Ferrell, yes,

20   sir.

21      Q.   And could you let the Court know what happened

22   to the alleged charges of family violence?

23      A.   I have no idea, sir.

24      Q.   You didn't check that they had been dismissed?

25      A.   No, sir.

1    Q.   That they were not even prosecuted?  That was

2 not something you checked?

3    A.   As far as Olga was concerned?

4    Q.   Yes.

5    A.   No, sir.  It wasn't relevant to my kidnapping

6 case.

7    Q.   Now, you also allege that my client's son has a

8 B1B2 visa.  Can you let the Court know what that is.

9    A.   So it's essentially his ability to stay in the

10 United States.  I believe it's like a tourist visa.

11    Q.   And it's valid till 2026?

12    A.   Again, sir, that's probably right.  I don't

13 know exactly right now.  I don't remember what the

14 expiration was on that.

15    Q.   Now, you did mention that all communications

16 with you and my client stopped around 2006?

17    A.   That's my recollection, sir, yes.

18    Q.   So that's 11 years.  Now, in 11 years, were you

19 [indiscernible] as to what my client's doing in

20 Argentina?

21    A.   Again, sir, your question?

22    Q.   On those 11 years that you had absolutely no

23 communication, were you checking as to the employment of

24 my client in Argentina?

25    A.   No.  No, sir.

1       Q.   And you were not looking whether or not he's

2  flying commercial planes or whatever the type of planes

3  in Argentina, right?

4       A.   No.   That's possible, sir.   I don't know.

5       Q.   Because all -- all of your contact with this

6  case ended around 2006, correct?

7       A.   Primarily 2007, sir.   That's when I left the El

8  Paso Division.

9       Q.   At least 10 years?

10      A.   Yes, sir.

11           MR. ACOSTA:   I'll pass the witness, Your

12  Honor.

13           MS. KANOF:   Nothing further.

14           THE COURT:   Okay.   Agent, you may be excused.

15           THE WITNESS:   Thank you, ma'am.

16           THE COURT:   Ms. Kanof, any other witnesses or

17  evidence for the government?

18           MS. KANOF:   No, Your Honor.

19           THE COURT:   Mr. Acosta --

20           MR. ACOSTA:   Yes, Your Honor.

21           THE COURT:   -- any witnesses or evidence?

22           MR. ACOSTA:   [Indiscernible].   Just on a matter

23  of proffer, Your Honor.

24           THE COURT:   Okay.   Go ahead.

25           MR. ACOSTA:   Thank you, Your Honor.

1     Your Honor, I would like to proffer to the

2  Court that my client's family is all here in El Paso.

3  My client's father has been a physician in El Paso, was

4  a cardiologist.  He retired, I would say, about maybe

5  eight or nine years ago.  But he's a cardiologist.  He's

6  a well-known member of our society, as well as Ms. Lydia

7  Christina Ruffier, Juan Carlos Ruffier.  Those are the

8  parents, Your Honor.  They do live on the east side of

9  town.  We have an address that we can provide to the

10  Court for bond purposes.

11     That is the same address, Your Honor, that my

12  client's son, Christopher, is living at.  He's going to

13  school here in El Paso as well.

14     For protection of the child, I would -- I don't

15  want to disclose the address publicly, but I will give

16  the address to the Court, obviously, and -- to protect

17  him.

18     Obviously, Your Honor, the family, he has

19  brothers and sisters.  David is one of them.  He is

20  present in the courtroom, David Ruffier, also.  And they

21  are all willing and ready to help Mr. Ruffier, my

22  client, establish his residence here in El Paso while

23  the -- the pendency of this case.

24     He is a flight instructor, Your Honor.  He's a

25  licensed pilot since 1992.  So he does have a way to be

1   employed.  Obviously, also, Your Honor, if there is

2   issues regarding him being in a flight school or a

3   flight area, like it was testified, he does have

4   experience in a -- a law firm type of work.  And one of

5   the family members is married to an attorney who can

6   also provide him some type of employment.  So employment

7   shouldn't be an issue, Your Honor.

8           The testimony of the family is that they all

9   intend to provide support for him and the client's

10  child, who is now legally in the custody of my client.

11  He was provided that through Argentina courts.  So it

12  shouldn't be an issue that he lives with his own son the

13  way he has been living with him for over nine years.

14          Your Honor, also, as a matter of proffer, I can

15  tell you that Mr. Ken Del Valle would testify that he

16  represented Mr. Ruffier just through the -- the

17  operation of the surrendering to the FBI.  This is not

18  a -- a case where the FBI went down and got him or

19  somebody got him out of a plane and forced him into our

20  court.  But Mr. Ruffier negotiated his surrender with

21  Mr. Ken Del Valle, and Ken Del Valle negotiated that

22  surrender with the FBI.

23          The day that he surrendered was Monday of last

24  week.  He brought -- he was brought into the bridge.  On

25  one side, we had Mr. -- I understand it was Mr. Ken Del

1  Valle of the FBI, on the other side was Mr. Ruffier and

2  his Argentinian attorney, and that's how the surrender

3  happened.

4          I would also say that Mr. Ken Del Valle had

5  informed him and knew that the judicial order and the --

6  in the state court for Linda Chew had been reversed by

7  the court of appeals and he would testify as to that.

8          The only reason, Your Honor, that obviously

9  Mr. Ken Del Valle would tell you the only reason it took

10 a little bit longer is because they needed to secure my

11 client's son's visa to come into the United States.  It

12 was not an easy process for them.  But once that visa

13 was secured and they secured money to travel, he was

14 able to travel.

15         He would also testify that in his

16 [indiscernible], he's not a flight risk.  Quite the

17 contrary, Your Honor.

18         And may I have a moment, Your Honor?

19         THE COURT:  Yes, go ahead.

20         MR. ACOSTA:  And lastly, Your Honor, also, as a

21 matter of proffer is that Mr. Ruffier, he turned himself

22 in, like I said, last Monday, but it was not the first

23 attempt.  He tried on several occasions at the U.S.

24 Consulate in Argentina to turn himself in, and he was

25 not received or not allowed to turn himself in at the

 1  consulate.

 2          Thank you, Your Honor.

 3          MS. KANOF:  Your Honor, may I respond with the

 4  government's proffer -- proffer, then?

 5          THE COURT:  Yes.  If you have additional

 6  proffer, go ahead, Ms. Kanof.

 7          MS. KANOF:  I didn't anticipate this, Your

 8  Honor, and I have the emails.  He didn't try to turn

 9  himself in at the consulate.  What he wanted was a visa

10  or a passport.  And I've got all the emails from the

11  legat in Argentina.  And what they did was they said no

12  because he had an outstanding warrant.  And he also

13  tried to get the indictment unsealed.

14          I would proffer to the Court -- and I have the

15  emails if the Court wants them -- Mr. Del Valle -- first

16  of all, if the Court remembers, Mr. Ruffier at the

17  initial appearance couldn't remember Mr. Del Valle's

18  name.  But Mr. Del Valle did email me a couple of months

19  ago that he had been engaged by Mr. Ruffier.  He didn't

20  say he was going to turn himself in, but just in this

21  matter.

22          The most interesting thing I was -- is that he

23  wanted to arrange a bond.  And I have the whole series

24  of emails, if the Court wants them.  I would be glad to

25  tender them to the Court.  And I said no.

1          But initially he said, "Could we arrange a
2   bond?  He wants to turn himself in."
3          I said, "No.  I'm glad to arrange a surrender,
4   but I will make a motion to detain without bond."
5          Then he said, "Well, can I have a copy of the
6   complaint or indictment?"  He appeared to not know
7   whether or not there was an indictment.
8          And I said, "No, but I would be glad to discuss
9   this with you if you want to come to my office."  We
10  talked about times.  It never happened.
11         Then, on the Thursday before he turned himself
12  in at -- in the evening, I got an email from Mr. Del
13  Valle that said, "My client wants to surrender himself
14  on Monday."
15         Well, I forwarded that email to Agent Rankin
16  who was in Florida, but also to the Chief of Criminal,
17  Margaret Leachman.  And I forwarded it to the FBI
18  saying, "You know, do you have enough time to make
19  arrangements to accommodate this," and I forwarded it to
20  Margaret Leachman.
21         Accidently, Ms. Leachman didn't realize that
22  Mr. Del Valle was on the email chain, and she did a
23  reply to all, and said, Ask me about Wendy?  Well, what
24  about Wendy?  And how is the child, or something --
25  that's not a direct quote.

1    Mr. Del Valle responded, "Who is Wendy?  I

2 thought this was about an international kidnapping.

3 What other child?"

4    What that told me is that the defendant didn't

5 even tell his own attorney about what was going on.

6    Defense has tried to make a point that perhaps

7 he should be freed on bond because he did know there

8 were other charges, but he hadn't even tell his own

9 attorney who Wendy Ferrell was and that there was

10 another child involved, and that he had another child in

11 this country.  That causes me a great concern with --

12 with regard to bond, and that he -- he had hired this

13 attorney and wasn't even freely communicating with him.

14    So, again, I have -- I have those emails

15 available.

16    With regard to the knowledge of what he has and

17 doesn't have --

18    THE COURT:  Do you have more proffer?  Is that

19 all your proffer and then we'll do arguments

20 afterward.

21    MS. KANOF:  Yes.  I'll proffer some additional

22 information about knowledge.

23    After the initial appearance, Your Honor, this

24 individual, Marissa Gonzalez, represented herself to be

25 his prosecutor, found out she was the defense attorney.

1    She indicated to the government that -- to me, and there
2    were three FBI agents present and the court interpreter
3    assisted -- that she had served me with papers that --
4    and demanded that --
5             MR. ACOSTA:  Your Honor, I am going to have to
6    object at this point as to relevance.
7             MS. KANOF:  This goes to his knowledge of what
8    charges were available and why he turned himself in.
9    The defense --
10            THE COURT:  I'm going to overrule the
11   objection.
12            But, Ms. Kanof, I'm going to give you an
13   opportunity to argue.  So if you have proffer --
14            MS. KANOF:  I can save it for argument, then,
15   Your Honor.
16            THE COURT:  All right.  Mr. Acosta, do you have
17   any other evidence or proffer you would like to make?
18            MR. ACOSTA:  No, Your Honor.
19            THE COURT:  All right.  Now, we will have
20   argument.  And again, Ms. Kanof, do you have any
21   argument?  Would you like to argue first?
22            MS. KANOF:  No.  I'll -- I'll reserve for
23   rebuttal.
24            THE COURT:  Okay.  Go ahead, Mr. Acosta.
25            MR. ACOSTA:  Thank you, Your Honor.

CLOSING ARGUMENT BY THE DEFENDANT

1

2        MR. ACOSTA:  Your Honor, to -- to make it a

3   little bit organized as to our request for bond, I'm

4   going to take the pretrial services report and go

5   through the things that they have listed to the Court as

6   the reasons why bond may or may not be recommended.

7        The report says that he presently resides in

8   Buenos Aires.  We know that is not true.  He is here in

9   El Paso and he surrendered himself in El Paso.

10        He does have family.  He does have long ties to

11   El Paso with his parents being here, his brothers being

12   here.  And now he's on trial being in El Paso with a

13   visa -- valid visa.  That testimony came out.  It's till

14   2026.

15        They talk about the previous travels to foreign

16   countries.  And again I would like to remind the Court,

17   this is a 12-year-old case.  And what they are mentioned

18   as far as travels is that he went to Mexico at some

19   point and then he want to Argentina at some point and

20   Paraguay.  But from what the officer of the FBI said,

21   after 2006, there is no more travels to be known of.

22        Now, whether or not there is foreign travels,

23   it's irrelevant because a court order can be clear that

24   he can no longer travel to Argentina, no longer travel

25   to Mexico, and that he has to stay in El Paso County,

1   like you would do with any other case.

2          It also mentions about the financial assets

3   here in El Paso.  And like we -- we provided during the

4   proffer, the whole family is here to support him.  The

5   whole family is already taking in my client's son,

6   and -- and provides support, and they plan to do the

7   same thing with my client.

8          He, like we mentioned, is a pilot, and he has

9   an opportunity to go teach or start working on that.

10  And if the Court feels that is improper, for whatever

11  reason, I -- I don't see why, but if there is any

12  argument about that, he does have employment in some

13  type of a law office since he had that type of

14  experience before.

15         They mention about my client's physical and

16  mental condition.  He does have heart issues, Your

17  Honor.  He's taking medication.  The U.S. marshals were

18  extremely kind, Your Honor, to the defense in -- in

19  providing the -- the proper medications, which we

20  appreciate greatly, Your Honor.

21         But how is that something that doesn't show

22  that he wants to be in this country.  His dad is a

23  cardiologist.  He's a well-known and respected doctor in

24  the community.  What better place for him to be if he

25  has any type of medical issues than El Paso.

1      So to me that sounds like something that

2 provides us more information that this is the right

3 place to be for him.  And he also knows that, Your

4 Honor.

5      Now, the one thing that is present, and I think

6 that's what the government is going to bring that the

7 pretrial services report says, is the offense.  And

8 let's look at the offense, Your Honor.  The offense

9 happened supposedly in 2005 or 2006.  You're talking

10 about over 11 years.  The one thing that -- that sticks

11 to my mind is when -- when the FBI Agent Rankin said,

12 "After 2006, we haven't known anything.  We don't know

13 nothing about him.  We didn't follow with anything."  He

14 lived his life perfectly, no issues, nothing like that.

15      So the threats -- I mean, that's the basis of

16 the case.  It's a case that's going to have to be

17 litigated whether or not there were actual threats or

18 not.  But to go back and say that this man 12 years ago

19 committed something and there's still a reason to detain

20 him because of that, I think that there is enough

21 safeguards here.

22      I asked the agent about the location of Ms.

23 Wendy Ferrell, right?  And I didn't ask him to disclose,

24 but I said, "Nobody knows about that, but you guys."  I

25 mean, it's not like we can -- he can go and travel and

1  look for her like that, because he's going to be under

2  the restrictions of the Court.

3          And a Court has done this in the past.  I think

4  that the Court can say, "You will have no contact with

5  certain people."  And obviously he's not supposed to

6  have contact with -- with the agent or the prosecutors

7  or -- or Ms. Wendy Ferrell, and that's one of the

8  conditions that the Court can -- can provide.

9          And, again, the Court can order mental health

10 counseling.  I think that's what the -- the services

11 report says about it.  That can also be included there.

12 There is many ways, Your Honor, for the Court to know

13 that my client is here.  The Court has ample ways to

14 control the movement of my client while he's released.

15         I know we have an ankle monitor that is

16 monitored by satellite.  If he was to try to remove it,

17 that signal would go immediately off.  And I know our

18 officers on probation would immediately let the U.S.

19 marshals know.  And like Judge Montalvo says, we have

20 some of the best U.S. marshals in the nation.

21         So I don't see an issue here as to why we're

22 not giving my client a bond.  I would ask the Court to

23 consider a bond.  And -- and, Your Honor, these are very

24 hardworking people.  His whole family are very

25 hardworking people that are willing to -- to provide

1    that bond.  And even if we need a third custodian or

2    whatever, we can provide that, Your Honor.

3            Thank you.

4            THE COURT:  Mr. Acosta, any other objections or

5    corrections to the pretrial services report?

6            MR. ACOSTA:  Well, I'm objecting as to the

7    reasons for keeping my -- my client detained.  Like I --

8    I tried to point out every reason, which seems illogical

9    to me at this point, Your Honor.

10           Thank you.

11           THE COURT:  Nothing else in terms of

12   corrections?

13           MR. ACOSTA:  No, Your Honor.

14           THE COURT:  Okay.  Thank you.

15           Ms. Kanof.

16           MS. KANOF:  Yes, Your Honor.  Thank you.

17           THE COURT:  Any objections or corrections from

18   the government on the pretrial services report?

19           MS. KANOF:  None, Your Honor.

20           THE COURT:  All right.  Go ahead.

21              CLOSING ARGUMENT BY THE GOVERNMENT

22           MS. KANOF:  Your Honor, the strength of the

23   case is one of the elements the Court can consider in --

24   in determining detention.  And so I would like to

25   address this 12-year absence a little bit and also

1  address the law a little bit.

2          In 2006, the Eighth Court of Appeals, in

3  sitting in El Paso -- the state court of appeals sitting

4  in El Paso did vacate the custody order, and they

5  vacated it based on jurisdiction that the child didn't

6  live in El Paso at the time.

7          I will tell you that I've done -- that at that

8  time, the defendant was represented by Leon Schydlower,

9  now a United States Magistrate Judge.  And Schydlower --

10 Mr. Schydlower, when he represented him, approached

11 Margaret Leachman, who his case it was at the time, with

12 that order and she rejected him.  The reason that she

13 rejected it is the status of the law.  A court order

14 doesn't have to be in place to violate the statue, and

15 it wasn't charged that way.

16         It was charged that knowingly and intentionally

17 removed a child from the United States and retained the

18 child outside the United States with intent to obstruct

19 the lawful exercise of parental rights, not with the

20 intent to obstruct a court order.

21         And basically, the statute does not require a

22 court order to be in place.  The statute merely requires

23 obstructing the lawful possession.  And what the courts

24 have said is they need to look at the state law to see

25 how state law defines parenting.  And you look to -- go

1   ahead and leave it there -- and in -- and I looked to

2   both Texas law as well as South Carolina law because she

3   brought the child from South Carolina for visitation.

4   She was following a court order, whether or not it was

5   intact -- well, let me go back.  The court order was

6   intact at the time that he kidnapped the child,

7   regardless.  And -- and so he did violate, at that time,

8   a valid court order.

9           But with regard to the status of the law,

10  what -- so Mr. Schydlower, I'm sure, communicated to his

11  client at that time that the government was not willing.

12  But in the *United States V* -- and I don't know how to

13  pronounce this *Homaune*, H-O-M-A-U-N-E, 898, Fed Supp

14  2nd, 153, it's a -- out of the D.C. District Court in

15  2012, they were just codifying and reiterating what had

16  been said by both the First Circuit and the Second

17  Circuit, and that is, for the simple reason that the

18  principle imbedded is so obvious, absent a court order,

19  both married parents have a right to physical custody of

20  their child, and the denial of that right is simply a

21  violation of that law.

22          So in looking both at the Texas law and looking

23  at South Carolina law, the definition of parenting --

24  and actually the South Carolina law is even stronger

25  than the Texas law.  The Texas law just says both

1    parents have the right to possession of the child, and

2    the South Carolina law even goes further, that they are

3    equally charged with the welfare and education and the

4    care and management of the estate.  And the mother and

5    father have equal power, rights, duties, and neither

6    right is paramount to the right of the other.  So I

7    don't have any question that -- that the charge is

8    legally sound.

9           But the point is that defense counsel has

10   argued over and over, it's been 12 years, it's been 12

11   years.  I really think that that is in favor of the

12   government's position, not the defense.  You know, why

13   didn't he come home in those 12 years?  Why didn't he

14   fight these charges?  Where was he?  Why didn't -- if he

15   has these loving parents that are going to support him,

16   why didn't he come live with them?  Why didn't he face

17   these charges that he -- that he now, for some reason,

18   thinks are invalid?

19          What happened, evidently, according to Ms.

20   Gonzalez, is that he somehow was litigated in Argentina.

21   This is what she told me outside the courtroom.  I

22   started to -- to tell the Court, but I do it instead in

23   argument instead of a proffer.  She confronted me fairly

24   aggressively, after misrepresenting herself as his

25   prosecutor.  She's his defense attorney.  Evidently, in

1   Argentina, you can be both, but you can't be both at the

2   same time.   And he was evidently acquitted in Argentina

3   of the kidnapping charges that Olga pressed against him.

4          And for some reason, I think that emboldened

5   him in the answer to why he is turning himself in now.

6   And I think that's corroborated by the emails that I got

7   from Mr. Del Valle.   I also think that perhaps his

8   health is a contributing factor as to why he turned

9   himself in.

10          Regardless, she said, "I served you and I told

11   you to unseal this indictment" because they weren't

12   sure.

13          In March of last year, 2016, on a Saturday

14   afternoon, I was served by a process server at my home.

15   So in other words, I have some concern that the

16   defendant knows where I live as well.   And he was very

17   aggressive.   And it was basically some documents that

18   appeared to be from Argentina, demanding -- it was a

19   demand letter demanding that I unseal the indictment.

20          And then I wasn't really sure what the rest of

21   it was.   It was civil, so I turned it over to our civil

22   section, who turned it over to the United States

23   Department of Justice Civil International Affairs

24   Section.   And they, in turn, turned it over to the State

25   Department, who said, "It's not valid.   Ignore it."

1  They said it's some kind of a demand letter and, of

2  course, you cannot demand me to unseal anything.  And it

3  purports to be the predicate to a suit in the

4  Americas -- under the Americas Convention of Human

5  Rights.  They said the problem is that they did not

6  probably cite a treaty to predicate it on or any kind of

7  a convention between the two countries.  And they --

8  they -- they just basically opined that it was a way to

9  circumvent any -- serving the United States government,

10  which is the only one they can sue.  They can't sue an

11  individual.

12         MR. ACOSTA:  Your Honor, I'm going to object at

13  this point.  This is irrelevant to the detention, first.

14  And we're arguing facts that were not even presented.

15         MS. KANOF:  Well, I'm responding to the 15 --

16  the 12 years, the 12 years.  It's safe to -- to --

17         THE COURT:  Overruled.

18         Go ahead, Ms. Kanof.  Let's move along.

19         MS. KANOF:  Okay.  Well, anyway, so that -- I

20  did not have any idea at that time, you know, the

21  connection until I was confronted after the initial

22  appearance.  And when the interpreter explained, my

23  explanation was, "I don't unseal things.  Judges do."

24         She proceeded to tell me that I could not

25  pursue these charges, because they -- he had been

1  acquitted in Argentina.  And I had already researched

2  this, and said, "No, that's not true at all.  They are

3  separate sovereigns."  I told her there is a United

4  States Supreme Court case that explained that.

5          She insisted, said that she had -- she talked

6  to American lawyers who said that I had to dismiss the

7  charges.  And I was done with the conversation, Your

8  Honor, frankly.

9          I said, "Look, the threats are in writing."

10          And she said, "In writing?"  And started --

11  welled up with tears.  And that's when I suspected the

12  relationship was more than attorney/client and I walked

13  away.  So then I connected the two.

14          And I understood better why the defendant

15  decided to come home because he thought he was going to

16  be scot-free.

17          I -- I think there is that great danger to

18  society, and when I -- and I understand better that

19  Mr. Del Valle certainly didn't think there were any

20  other charges than the kidnapping charge and may have

21  believed because the -- Ms. Gonzalez explained to him

22  that he had been acquitted, that he could get bond, and

23  that they would be resolved.  I think that's why he's

24  here.  I think that there was a sincere belief on the

25  part of his counsel, at least from Argentina as well as

1  perhaps Mr. Del Valle, that it was going to be resolved

2  and he would be scot-free and probably bonded.

3          With regard to Ms. Ferrell, Mr. Acosta said

4  he's -- it's not like he can go look for her.  Well, it

5  is like Mr. Jay Armes can go look for her, and that's a

6  great concern on the part of the government, because

7  whether or not -- first of all, Olga Ruffier, after she

8  had spent her time at the Transitional Living Center,

9  didn't press charges because she went back to Russia.

10  So we do at least have some evidence that's been

11  presented to the Court of beating two different wives.

12          We have threats against Judge Chew.  We have an

13  aggressive attempt to demand that I unseal an indictment

14  and that I dismiss charges through representatives of

15  the defendant.

16          We have 12 whole years where Mr. Acosta

17  represented that he lived a perfect life.  So on one

18  side, he's saying, you know, we don't know anything

19  about him in those 12 years, and on the other side, he

20  said he lived a perfect life for those 12 years, which

21  is kind of inconsistent arguments.  If we don't know

22  anything about him, how do we know he lived a perfect

23  life?  We have no idea what he did for those 12 years,

24  except we know he did not come to the United States.

25          His parents are elderly.  I don't know how much

1   they can control his son -- their son because I'm sure

2   they would have liked for him to come back or maybe they

3   wouldn't.  I don't know.  But regardless, we -- we don't

4   know anything about what happened.

5          We do know that he has not changed his attitude

6   or his demeanor, because from the very beginning, he

7   engaged the threat of going to war.  He told Wendy he

8   was going to go to war with her.

9          And by the way, the reason the threats quit in

10  2006 is because she stopped communicating with him.  I

11  don't know what kind of threats there would have been if

12  she didn't stop communicating with him.  And so did the

13  FBI.  I don't know whether there would have been threats

14  or not, but the cessation doesn't mean he was a good

15  boy.

16         What we do know is that his attitude has not

17  changed, because the day before he turned himself in, on

18  his open Facebook account, he proudly proclaimed it was

19  time to go to war.

20         And, Your Honor, I don't want to be part of

21  that war anywhere other than this courtroom, and we ask

22  the Court to detain the defendant for the safety.

23         And by the way, he's a flight instructor.  They

24  want him to get into an airplane and go into any air

25  space as his employment.  I think that would enhance his

1    likelihood of flight.

2              THE COURT:  Thank you, Ms. Kanof.

3              First of all, I am going to find that the

4    defendant has been properly identified.  I am also

5    finding that Mr. Ruffier is a flight risk and a danger

6    to the community, and I'm going to grant the

7    government's motion to detain.

8              We'll be in recess.

9              (Proceedings concluded)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF ELECTRONIC RECORDING

2

3              I, Rhonda McCay, CSR, RPR, certify that the

4    foregoing is a correct transcription from the electronic

5    recording of the proceedings in the above-entitled

6    matter.

7              I further certify that I am neither counsel

8    for, related to, nor employed by any of the parties

9    to the action in which this electronic recording was

10   taken, and further that I am not financially or

11   otherwise interested in the outcome of the action.

12              Signed this 27th day of March, 2017.

13

14

15   /s/ Rhonda McCay_____
     Rhonda McCay, RPR, CSR 4457
16   Date of Expiration:  12/31/2018
     REPORTERS INK, LLC
17   221 North Kansas, Suite 1101
     El Paso, Texas 79901
18   Ph.: 915.544.1515

19

20

21

22

23

24

25